On Application for Rehearing

CRAWLEY, Presiding Judge.
The opinion of this court issued on November 19, 2004, is withdrawn, and the following is substituted therefor.
K.W.J. (“the biological father”) appeals from a judgment of the Madison Probate Court denying his contest to the adoption of E.C.B., an infant girl (“the child”), by J.W.B. and K.E.M.B. (“the adoptive parents”). We reverse and remand on the authority of Ex parte F.P., 857 So.2d 125 (Ala.2003).
The child was born on May 4, 2003, in Gwinnett County, Georgia. The biological *1076 father and E.M.M. (“the birth mother”), who are both residents of Georgia, had been dating for several months when they learned, in October 2002, that the birth mother was pregnant. Initially, the biological parents decided to marry and raise the child together. The birth mother, however, broke off the engagement and, three weeks after the child was born, gave her consent to the child’s adoption by the adoptive parents, who are residents of Madison County, Alabama.
The evidence was in conflict with regard to the amount of prebirth support the biological father provided for the birth mother and the unborn child. The biological father testified that he purchased food and maternity clothes for the birth mother, baby clothes for the child, and nursery furniture, including a crib and a chair, for the child’s room. He said that he spent approximately $200 per month on the birth mother during her pregnancy. He stated that he had established a bank account for the child and that he had arranged for her to be included under his health insurance coverage. The birth mother testified that, with the exception of three co-payments the father made to cover her prenatal care and a few meals he paid for on “dates,” the biological father provided no financial support before the child’s birth.
It is undisputed that the biological father was at the hospital with the birth mother when she went into labor; he was not present, however, for the birth of the child. The biological father testified that he wanted to stay at the hospital for the birth of the child, but, he said, the birth mother’s mother (“the maternal grandmother”) told him he was not the father of the child and ordered him to leave the hospital because he was upsetting the birth mother. The birth mother testified that she had wanted the biological father to be with her for the birth of the child, and, she said, when he could not be located in response to her request, she thought he had abandoned her and the baby.
The biological father testified that he tried to reach the birth mother numerous times every day for three weeks after the birth of the child but that the birth mother did not return his telephone calls or acknowledge the messages he had left on her answering machine. The birth mother testified that she had received no telephone calls or messages from the biological father for three weeks after the child’s birth and that, during that time, she decided to consent to the child’s adoption by a couple from Huntsville, Alabama. She explained that, although she had been introduced to the adoptive parents by a woman from her church the day after the child’s birth, it had taken her three weeks to conclude that adoption was the best option for her.
On May 27, 2003, the birth mother signed a form giving her consent to the adoption and the adoptive parents took the child to Huntsville. On June 25, 2003, the adoptive parents filed in the Madison Probate Court a petition to adopt the child. On June 30, 2003, the probate court entered an interlocutory order awarding custody of the child to the adoptive parents pending a final dispositional hearing to be conducted on August 29, 2003. The biological father stated that sometime in June 2003 he saw the maternal grandmother and inquired where the child was; the maternal grandmother replied that the child was “with family.” On July 14, 2003, the biological father received notice of the adoption petition.[1] The biological father *1077 testified that the birth mother had never mentioned the idea of adoption to him. He stated that not only had he been unaware before receiving the notice that the child had been placed with adoptive parents but also that he had no idea the child had been removed from the state of Georgia.
On July 15, 2003, the biological father filed in the Superior Court of Gwinnett County, Georgia, a petition for legitimation, a motion for genetic tests, and a request for custody of the child. On July 23, 2003, the biological father filed an objection to the adoption in the Madison Probate Court, requesting that the adoption be held in abeyance until the completion of the genetic testing. DNA test results obtained on August 25, 2003, established that the probability of the biological father’s paternity of the child was 99.998 percent.
On September 11, 2003, the adoptive parents filed in the Superior Court of Gwinnett County, Georgia, a motion to intervene and a motion to dismiss the legitimation proceeding. On October 6, 2003, the Georgia court granted the adoptive parents’ motions to intervene and to dismiss, ruling that it had no jurisdiction, pursuant to the Uniform Child Custody Jurisdiction and Enforcement Act (“the UCCJEA”), to determine paternity or child custody because, it held, Alabama was the child’s “home state” and an Alabama court had already made an “initial child custody determination.” See § 30-3B-102(8) and § 30-3B-201(a)(l), Ala. Code 1975. The biological father did not appeal the Georgia court’s ruling, and he does not contest the jurisdiction of the Madison Probate Court.
It is undisputed that the biological father was not asked by the birth mother or by the adoptive parents to provide any financial support for the child after the child’s birth. It is also undisputed that the biological father did not offer to provide, nor did he actually provide, any financial support for the child after her birth. The biological father saw the child only once before the trial of the adoption contest. In August 2003, after all parties had learned the results of the DNA paternity test, the adoptive parents, who were on their way to Florida for a vacation, detoured through Georgia to see the biological father. On that occasion, the adoptive parents suggested the idea of an “open adoption” to the biological father. When the biological father rejected the suggestion, stating that he would agree to nothing less than full custody of the child, the adoptive parents became upset and left. The biological father testified that he had asked the adoptive parents to allow him to visit the child during Christmas 2003 and that the adoptive parents had refused. It is undisputed that the birth mother visited the child during Christmas 2003 and at other timés.
The probate court conducted a hearing on the adoption contest on January 29, 2004, and February 11, 2004. On April 26, 2004, the probate court entered a judgment, which included the following pertinent findings and conclusions:
“1. That the contest filed by [the biological father] is hereby denied.
“2. That this Court finds that [the biological father] has failed to maintain a significant relationship with the minor child, the subject of this matter; and the said [biological father] has not been prevented from maintaining a significant parental relationship with said minor child; [the biological father] has not provided or offered to provide any financial or emotional support for said minor child; the failure of [the biological father] to maintain a significant parental relationship was for a period in excess of *1078 six months during which [the biological father] had full knowledge of the name and location of the legal representative of [the adoptive parents] in whose custody the minor child has resided.
“That this Court having considered all of the testimony adduced at trial finds that there is clear and convincing evidence that the consent of [the biological father] to the adoption is implied pursuant to the Code of Alabama Section 26-10A-9 due to the failure of [the biological father] to maintain a significant parental relationship with said minor child for a period of six months.
“3. [The biological father] also acknowledged that Alabama had full jurisdiction.
“4. It would be in the best interest of the minor child to deny the contest of [the biological father] and to grant the adoption.”
As can be seen from the foregoing order, the probate court determined that the biological father, by failing to maintain a significant parental relationship with the child for a period of six months or more, had impliedly consented to the adoption of the child.[2]
In F.P. v. J.K.M., 857 So.2d 110 (Ala.Civ.App.2001), the juvenile court denied a biological father’s petition for custody of a child born out of wedlock, terminated the biological father’s parental rights to the child, and granted the petition of a couple to adopt the child based on its finding that the biological father had impliedly consented to the adoption by failing to support the child and by failing to maintain a significant parental relationship with the child. This court affirmed the judgment of the juvenile court. Presiding Judge Yates, joined by Judge Crawley, dissented. The Alabama Supreme Court reversed this court’s judgment, adopting Judge Yates’s dissent. Ex parte F.P., 857 So.2d 125 (Ala.2003). The supreme court held that the biological father, who had never seen his child before the trial of the adoption petition and who had not provided any support to the mother or to the adoptive parents after the birth of the child, could, nevertheless, not be deemed to have impliedly consented to the adoption of the child pursuant to § 26-10A-9(a)(l)(abandon-ment of the child) or § 26-10A-9(a)(3)(fail-ure to maintain a significant parental relationship with the child) because, before the child’s birth, he took the following steps to pursue his parental rights through legal action: he petitioned the juvenile court for a determination of the father-child relationship; he registered with the Putative Father Registry; he requested a blood test to determine paternity; and he moved for a stay of the adoption proceedings pending the paternity determination. The Alabama Supreme Court held that, “[p]ost-birth, the father had a justifiable excuse for failing to establish a relationship with the child — the adoptive parents did not wish to allow him to do so.” Ex parte F.P., 857 So.2d at 138.
In the present case, the biological father took the same steps that the biological father in Ex parte F.P. took (with the exception of registering with the Putative Father Registry[3]) to pursue his parental *1079 rights through legal action. One day after he received notice of the pending adoption, the biological father filed a legitimation action in Georgia, seeking genetic testing and custody of the child. Two and one-half months after the child’s birth, he contested the adoption and asked for a stay of the adoption proceedings pending the outcome of the paternity testing. As in Ex parte F.P., the biological father had a “justifiable excuse for failing to establish a relationship with the child — the adoptive parents did not wish to allow him to do so.” 857 So.2d at 138. In short, there is no principled distinction between this case and Ex parte F.P.
Accordingly, we conclude that the Madison Probate Court erroneously applied the law to the facts. That court’s judgment approving the adoption and denying the adoption contest is, therefore, reversed. Because the birth mother signed a consent to have the child adopted by named individuals (J.W.B. and K.E.M.B.) and because the adoption by those individuals cannot proceed in the absence of the biological father’s consent, we conclude that the parties will return to the status quo ante and custody of the child will revert to the birth mother pending any further proceedings. See generally Ex parte D.J., 645 So.2d 303, 307 (Ala.l994)(stating that “ ‘[tjhere is a strong presumption in Alabama, which has not been modified or abolished either judicially or legislatively, that the mother of a child born out of wedlock has a superior right of custody over all other persons, absent good cause that custody should not be vested in her’ ’’Xquoting Rainer v. Feldman, 568 So.2d 1226, 1227 (Ala.1990)).
OPINION OF NOVEMBER 19, 2004, WITHDRAWN; OPINION SUBSTITUTED; APPLICATION OVERRULED; REVERSED AND REMANDED.
THOMPSON and PITTMAN, JJ., concur in the result, without writing.
MURDOCK, J., dissents, with writing, which BRYAN, J., joins.

. Section 26-10A-17(a)(10), Ala.Code 1975, requires that notice of the pendency of an adoption proceeding shall be served on
"[t]he father and putative father of the adoptee if made known by the mother or otherwise known by the court unless the court finds that the father or putative father has given implied consent to the adoption, as defined in Section 26-10A-9.”

. Section 26-10A-9, Ala.Code 1975, provides, in pertinent part:
"(a) A consent or relinquishment required by Section 26-1OA-7 may be implied by any of the following acts of a parent:
[[Image here]]
"(3) Knowingly leaving the adoptee with odrers without provision for support and without communication, or not otherwise maintaining a significant parental relationship with the adoptee for a period of six months.”

. Section 26-10A-7(a)(5), Ala.Code 1975, a part of the Alabama Adoption Code, provides that consent to an adoption is required of various parties, including
*1079 "[t]he putative father if made known by the mother or is otherwise made known to the court provided he complies with Section 26-10C-1 [the Putative Father Registry Act] and he responds within 30 days to the notice he receives under Section 26-10A-17(a)(10).”
All parties concede that the Alabama Putative Father Registry Act is not applicable to this case because the child was born in Georgia and both biological parents are Georgia residents.