SMITH, Justice.
The Madison Probate Court denied the contest of K.W.J. (“the biological father”) to the adoption of E.C.B., an infant child (“the child”), by J.W.B. and K.E.M.B. (“the adoptive parents”). The biological father appealed, and the Court of Civil Appeals, in an opinion by Presiding Judge Crawley in which two judges concurred in the result, reversed and remanded on the authority of Ex parte F.P., 857 So.2d 125 (Ala.2003), concluding that the Madison Probate Court had erroneously applied the law to the facts. The Court of Civil Appeals ordered that the parties return to the “status quo ante,” with custody of the child reverting to the birth mother pending further proceedings. K.W.J. v. J.W.B., 933 So.2d 1075 (Ala.Civ.App.2005). This Court granted certiorari review. We now reverse the judgment of the Court of Civil Appeals because there are principled distinctions between this case and Ex parte F.P., on which that court relied. Additionally, the probate court based its judgment on ore tenus evidence and properly applied the law to the evidence; its judgment, therefore, is due to be affirmed.

Facts

Most of the evidence in this case is in conflict. A thorough discussion of both the *1083 disputed and the undisputed facts is relevant to our disposition of the case.
The child was born on May 4, 2003, in Gwinnett County, Georgia. The biological father and the birth mother were both residents of Georgia. They had dated for approximately two months when the birth mother learned in August 2002 that she was pregnant. By all accounts, the biological father and the birth mother initially discussed marriage. The biological father maintains that the couple had an engagement party in December 2002. While the biological father contends that his relationship with the birth mother was “rocky,” in large part because, he says, the birth mother was emotionally unstable, he maintains that even at the hospital, just before the child’s birth, he and the birth mother were discussing marriage. In contrast, the birth mother contends that after she returned the engagement ring within days of receiving it in October 2002, the biological father filed for a temporary restraining order against her, “manipulating” her into complying with his demands. While she continued to see the biological father, she denies that a Christmas party held in December was an engagement party, and she denies that she and the biological father were still planning to be married at the time the child was born.
The birth mother testified that the biological father knew during the entire pregnancy that there was the possibility that another man could actually be the father of the child. She recalled conversations with the biological father in which he would make calculations with a calendar regarding the dates on which she and he had had intercourse and that those discussions “caused a lot of fights.” The biological father stated that while there was some initial indication that another individual might have been the child’s father, the birth mother reassured him on a number of occasions that he was the child’s father. He testified that he knew shortly after the child’s birth in mid- to late May that the other man had been excluded as the father of the child. The maternal grandmother testified that the mother of the biological father initially wanted to host a baby shower for the birth mother, but later expressed her hesitanee to attend a shower, wanting to avoid embarrassment, because, she said, there was a “fifty-fifty chance” that another man was actually the child’s father.
The evidence regarding the amount of prebirth support the biological father provided the birth mother and the unborn child is in conflict. The biological father testified that because the birth mother had problems with her own parents, she frequently stayed overnight at his house, as often as “five times a week.” He says that her driver’s license had been suspended and that she depended on him for transportation. The biological father testified that he purchased food and maternity clothes for the birth mother, baby clothes for the unborn child, and that he and the mother set up a nursery at his house, including a crib and a “bouncy chair.” He said that he spent approximately $200 per month on the birth mother during her pregnancy and that he had made inquiries about including the child on his health insurance after the child was born. He further testified that he had established a bank account for the child, although he never testified as to any amount that had been deposited into that account. The biological father testified that he attended “parenting classes” with the birth mother before and on his own after the child was born and that he attended doctor visits with the birth mother approximately eight or nine times. He denies that he has incurred substantial debt.
The birth mother denies that the biological father furnished any prebirth support *1084 for her or the unborn child, with the exception of three co-payments the biological father made to cover her prenatal care and a few meals he paid for on their “dates.” She maintains that he never purchased maternity clothes for her and that she never saw or received any baby clothes for the child that had been purchased by the biological father. The birth mother contends that the biological father has incurred substantial debt.
The biological father testified that he prepared a nursery in his house for the child before she was born. The birth mother testified that while she and the biological father selected a “Winnie the Pooh” theme to decorate the nursery, she never saw a nursery at the biological father’s house, despite the fact that she visited there just days before the child’s birth. The birth mother did admit that she and the biological father agreed on the name of the child.
The maternal grandmother testified that her daughter lived at home during her pregnancy and that she, along with members of her church, purchased nursery items and clothing for her daughter. She said that her daughter initially had difficulty securing a doctor’s appointment, so her daughter was first seen at a pregnancy clinic where the possibility of adoption was mentioned and an ultrasound was performed. She further testified that the biological father attended only 3 or 4 of the 15 to 20 doctor and hospital visits and that the biological father wanted the birth mother to secure assistance from Medicaid rather than pay the co-pay on the health insurance.
The birth mother admits that the biological father attended several doctor appointments with her, primarily in December 2002, and that, in particular, he was with her at the appointment when she had the first ultrasound. In addition, she stated that the biological father met once with a woman at the pregnancy center, and, on a few occasions, he watched movies relating to pregnancy and birth with the birth mother at the center. She stated he declined to attend birthing classes despite her request that he do so. While the biological father contends that he and the birth mother never discussed the issue of adoption, the birth mother testified otherwise, recalling that every time she mentioned the possibility of adoption, the biological father would “go into a rage.”
The birth mother testified that she telephoned the paternal grandmother to take her to the hospital on the occasion of the child’s birth because her mother was out of town and she could not reach her father, who had hearing problems, by telephone. The birth mother experienced medical complications during her pregnancy and at the time of the child’s birth. Although she was scheduled only for a regular doctor visit on May 2, 2003, she was admitted to the hospital because of concerns with her blood pressure and swelling.
The parties likewise dispute the events at the child’s birth and in the months that followed. The birth mother and the maternal grandmother testified that the biological father came to the hospital with friends and family on the date she was admitted and created a party-like atmosphere-complete with food and ice coolers with beverages. The maternal grandmother admitted asking the biological father to remain in the waiting room at the hospital, rather than in the birth mother’s room, because of her daughter’s serious medical condition. When the biological father objected, the maternal grandmother said that she had a discussion with him regarding her daughter’s condition and the fact that there was a “fifty-fifty” chance that he was not the child’s father. She said she returned to the waiting room later in the evening to update him on the sitúa *1085 tion but that he had left the hospital. The biological father testified that the maternal grandmother ordered him off of the premises, threatened to have him removed if he did not leave, and informed him that he was not the father of the child. The maternal grandmother denied threatening to have him removed from the hospital if he did not leave.
The birth mother testified that she had wanted the biological father to be with her for the birth of the child. She said that she left a voice message on the biological father’s cell phone conveying that she was upset that he had left the hospital. According to the birth mother, when the biological father did not return to the hospital and did not contact her in person or. by telephone in the three weeks following the birth of the child, she thought that he had abandoned her and the child.
The biological father contends that in the weeks following the child’s birth he tried to reach the birth mother numerous times each day but that the birth mother did not return his telephone calls or acknowledge the messages he left for her. The birth mother testified that she received no telephone calls or messages for three weeks after the child’s birth, and that during that time she decided to place the child for adoption. She explained that although a woman from her church had introduced her to the adoptive parents the day after the child was born, she was so undecided at that time about whether to place the child for adoption that she made appointments with a pediatrician a month in advance until she ultimately decided, three weeks after the child’s birth, that adoption was the best option.
Some evidence regarding the events that followed the birth of the child on May 4, 2003, is not in dispute. The maternal grandmother testified that after the biological father left the hospital on the day of the child’s birth, she telephoned him in the early evening hours to tell him that the birth mother was in labor. She telephoned again after the baby was born at approximately 3:00 a.m. to tell him that the child had been born and that both the birth mother and the child were doing well. The birth mother introduced telephone bills documenting the calls, and the biological father never denied that the maternal grandmother had left him those messages. The biological father contacted an attorney within a day or two of the child’s birth and again 10 to 12 days later. The biological father did not, however, initiate any legal proceedings at that time. The child remained with the birth mother for three weeks following its birth. During this period, the paternal grandmother saw the birth mother and the child at a local store in the community. The biological father knew within two to four weeks after the birth of the child that DNA testing had excluded the other man as the father of the child. On May 27, 2003, the birth mother signed a form consenting to the child’s adoption, and the adoptive parents took the child to their home in Alabama. On June 25, 2003, the adoptive parents filed in the Madison Probate Court a petition to adopt the child. On June 30, 2003, the probate court entered an interlocutory order awarding custody of the child to the adoptive parents pending a final dispositional hearing to be conducted on August 29, 2003. The biological father testified that in June 2003 he saw the maternal grandmother and inquired as to the child’s whereabouts. The maternal grandmother replied that the child was “with family.” On July 14, 2003, the biological father received notice of the adoption proceedings. He stated that he had been unaware before he received the notice that the child had been placed with the adoptive parents in Alabama.
*1086 The Court of Civil Appeals’ decision accurately states the remaining uncontested facts:
“On July 15, 2003, the biological father filed in the Superior Court of Gwin-nett County, Georgia, a petition for legitimation, a motion for genetic tests, and a request for custody of the child. On July 23, 2003, the biological father filed an objection to the adoption in the Madison Probate Court, requesting that the adoption be held in abeyance until the completion of the genetic testing....
“On September 11, 2003, the adoptive parents filed in the Superior Court of Gwinnett County, Georgia, a motion to intervene and a motion to dismiss the legitimation proceeding. On October 6, 2003, the Georgia court granted the adoptive parents’ motions to intervene and to dismiss, ruling that it had no jurisdiction, pursuant to the Uniform Child Custody Jurisdiction and Enforcement Act (‘the UCCJEA’), to determine paternity or child custody because, it held, Alabama was the child’s ‘home state’ and an Alabama court had already made an ‘initial child custody determination.’ See § 30-3B-102(8) and § 30-3B-201(a)(1), Ala.Code 1975. The biological father did not appeal the Georgia court’s ruling, and he does not contest the jurisdiction of the Madison Probate Court.
“It is undisputed that the biological father was not asked by the birth mother or by the adoptive parents to provide any financial support for the child after the child’s birth. It is also undisputed that the biological father did not offer to provide, nor did he actually provide, any financial support for the child after her birth. The biological father saw the child only once before the trial of the adoption contest. In August 2003, after all parties had learned the results of the DNA paternity test, the adoptive parents, who were on their way to Florida for a vacation, detoured through Georgia to see the biological father. On that occasion, the adoptive parents suggested the idea of an ‘open adoption’ to the biological father. When the biological father rejected the suggestion, stating that he would agree to nothing less than full custody of the child, the adoptive parents became upset and left. The biological father testified that he had asked the adoptive parents to allow him to visit the child during Christmas 2003 and that the adoptive parents had refused. It is undisputed that the birth mother visited the child during Christmas 2003 and at other times.
“The probate court conducted a hearing on the adoption contest on January 29, 2004, and February 11, 2004. On April 26, 2004, the probate court entered a judgment, which included the following pertinent findings and conclusions:
“ ‘1. That the contest filed by [the biological father] is hereby denied.
“ ‘2. That this Court finds that [the biological father] has failed to maintain a significant relationship with the minor child, the subject of this matter; and the said [biological father] has not been prevented from maintaining a significant parental relationship with said minor child; [the biological father] has not provided or offered to provide any financial or emotional support for said minor child; the failure of [the biological father] to maintain a significant parental relationship was for a period in excess of six months during which [the biological father] had full knowledge of the name and location of the legal representative of [the adoptive parents] in whose custody the minor child has resided.
“ ‘That this Court having considered all of the testimony adduced at trial finds that there is clear and convine- *1087 tag evidence that the consent of [the biological father] to the adoption is implied pursuant to the Code of Alabama Section 26-10A-9 due to the failure of [the biological father] to maintain a significant parental relationship with said minor child for a period of six months.
“ ‘3. [The biological father] also acknowledged that Alabama had full jurisdiction.
“ ‘4. It would be in the best interest of the minor child to deny the contest of [the biological father] and to grant the adoption.’ ”
K.W.J., 933 So.2d at 1077-78.
The Court of Civil Appeals concluded that the probate court wrongly determined that the biological father had impliedly consented to the adoption by failing to maintain a significant parental relationship with the child. Citing Ex parte F.P., the Court of Civil Appeals held that any failure on the part of the father to establish a parental relationship with the child was justifiably excused because “ ‘the adoptive parents did not wish to allow him to do so.’” K.W.J., 933 So.2d at 1078 (quoting Ex parte F.P., 857 So.2d at 138) (citations to the record omitted).

Analysis

“Where a probate court hears ore tenus evidence on a petition for adoption, its findings and conclusions based on that evidence are presumed to be correct.” K.P. v. G.C., 870 So.2d 751, 757 (Ala.Civ.App.2003). The ore tenus presumption of correctness arises because the trial court is in a position to observe the demeanor and behavior of the witnesses and is thus able to evaluate whether their testimony is credible and truthful. Ex parte Fann, 810 So.2d 631, 633 (Ala.2001); Ex parte Bryowsky, 676 So.2d 1322, 1324 (Ala.1996). The trial court is able to make personal observations of the witnesses, while an appellate court has the benefit only of a cold transcript of the proceedings. Thus, neither this Court nor the Court of Civil Appeals may reweigh the evidence or sit in judgment of disputed evidence presented ore tenus, Ex parte Bryowsky, 676 So.2d at 1324-1326, and the trial court’s judgment based on ore tenus evidence will not be disturbed unless it is palpably wrong, manifestly unjust, or without supporting evidence. Samek v. Sanders, 788 So.2d 872, 876 (Ala.2000).
Section 26-10A-17(a)(l), Ala.Code 1975, requires that notice of the pendency of an adoption proceeding shall be served on
“[t]he father and putative father of the adoptee if made known by the mother or otherwise known by the court unless the court finds that the father or putative father has given implied consent to the adoption, as defined in Section 26-10A-9.”
Section 26-10A-9, Ala.Code 1975, provides as follows:
“(a) A consent or relinquishment required by Section 26-10A-7 may be implied by any of the following acts of a parent:
“(1) Abandonment of the adoptee. Abandonment includes, but is not limited to, the failure of the father, with reasonable knowledge of the pregnancy, to offer financial and/or emotional support for a period of six months prior to the birth.
“(2) Leaving the adoptee without provision for his or her identification for a period of 30 days.
“(3) Knowingly leaving the adoptee with others without provision for support and without communication, or not otherwise maintaining a significant parental relationship with the adoptee for a period of six months.
“(4) Receiving notification of the pendency of the adoption proceedings under Section 26-10A-17 and failing *1088 to answer or otherwise respond to the petition within 30 days.
“(5) Failing to comply with Section 26-10C-1.
“(b) Implied consent under subsection (a) may not be withdrawn by any person.”
The Court of Civil Appeals held that the evidence was insufficient to establish that the biological father had impliedly consented to the adoption of his child because he had a justifiable excuse for failing to maintain a relationship with the child — the adoptive parents prevented the biological father from seeing the child. In so ruling, the Court of Civil Appeals relied on Ex parte F.P.:
“In F.P. v. J.K.M., 857 So.2d 110 (Ala.Civ.App.2001), the juvenile court denied a biological father’s petition for custody of a child born out of wedlock, terminated the biological father’s parental rights to the child, and granted the petition of a couple to adopt the child based on its finding that the biological father had impliedly consented to the adoption by failing to support the child and by failing to maintain a significant parental relationship with the child. This court affirmed the judgment of the juvenile court. Presiding Judge Yates, joined by Judge Crawley, dissented. The Alabama Supreme Court reversed this court’s judgment, adopting Judge Yates’s dissent. Ex parte F.P., 857 So.2d 125 (Ala.2003). The supreme court held that the biological father, who had never seen his child before the trial of the adoption petition and who had not provided any support to the mother or to the adoptive parents after the birth of the child, could, nevertheless, not be deemed to have impliedly consented to the adoption of the child pursuant to § 26-10A-9(a)(l)(abandonment of the child) or § 26-10A-9(a)(3)(failure to maintain a significant parental relationship with the child) because, before the child’s birth, he took the following steps to pursue his parental rights through legal action: he petitioned the juvenile court for a determination of the father-child relationship; he registered with the Putative Father Registry; he requested a blood test to determine paternity; and he moved for a stay of the adoption proceedings pending the paternity determination. The Alabama Supreme Court held that, ‘[pjostbirth, the father had a justifiable excuse for failing to establish a relationship with the child — the adoptive parents did not wish to allow him to do so.’ Ex parte F.P., 857 So.2d at 138.”
K.W.J., 933 So.2d at 1078.
The Court of Civil Appeals concluded that there was “no principled distinction between this case and Ex parte F.P.”:
“In the present case, the biological father took the same steps that the biological father in Ex parte F.P. took (with the exception of registering with the Putative Father Registry3) to pursue his parental rights through legal action. One day after he received notice of the pending adoption, the biological father filed a legitimation action in Georgia, seeking genetic testing and custody of the child. Two and one-half months after the child’s birth, he contested the adoption and asked for a stay of the adoption proceedings pending the outcome of the paternity testing. As in Ex parte F.P., the biological father had a ‘justifiable excuse for failing to establish a relationship with the child — the adoptive parents did not wish to allow him to do so.’ 857 So.2d at 138.
‘‘3Section 26-10A-7(a)(5), Ala.Code 1975, a part of the Alabama Adoption Code, provides that consent to an adop *1089 tion is required of various parties, including
“ ‘[t]he putative father if made known by the mother or is otherwise made known to the court provided he complies with Section 26-10C-1 [the Putative Father Registry Act] and he responds within 30 days to the notice he receives under Section 26-10A-17(a)(10).’
“All parties concede that the Alabama Putative Father Registry Act is not applicable to this case because the child was born in Georgia and both biological parents are Georgia residents.”
K.W.J., 933 So.2d at 1078-79.
The Court of Civil Appeals thus reversed the probate court’s judgment granting the adoption and denying the biological father’s contest to the adoption, holding that the probate court had “erroneously applied the law to the facts.” K.W.J., 933 So.2d at 1079. Judge Mur-dock issued a dissenting opinion, which Judge Bryan joined.
Ex parte F.P., on which the Court of Civil Appeals relied, is distinguishable from this case. While it is true, as the Court of Civil Appeals noted, that in the present case the biological father eventually took steps somewhat similar to the steps taken by the father in Ex parte F.P. to preserve his parental rights through legal action (with the exception of registering in accordance with the Putative Father Registry Act, § 26-10C-1, Ala.Code 1975), the timing of those steps and the facts regarding efforts by the biological father to maintain a relationship with the child — and any alleged interference with those efforts— are significantly different. In Ex parte F.P., the father and the mother, before their child’s birth, could not date “openly” because they were of different races and her family did not approve of her dating the father. The father in Ex parte F.P. actually filed a petition for a determination of a “father and child relationship,” 857 So.2d at 127, before the child was born. The child was placed with the adoptive parents upon its discharge from the hospital. The mother, from the outset, lied to the Department of Human Resources social worker, stating that she did not know the father’s whereabouts. The adoptive parents took the child home from the hospital, and the father was told unequivocally before the adoption that he could not see his child. The father and the paternal grandmother also tried to see the baby shortly after it was born, but they were told that they could not see the baby without the mother’s permission. The father made one attempt to contact the adoptive parents by telephone before the hearing, but he was told by a relative of the adoptive parents who was babysitting that he could not see the child. The adoptive parents testified that they were not sure they wanted the father to have contact because he was contesting the adoption and that they would consider requests from him to see the child to be “harassing calls.” Ex parte F.P., 857 So.2d at 131.
In the present case, the biological father contends that interference began at the child’s birth when he was told by the maternal grandmother to leave the hospital and threatened with legal action if he failed to do so. He also contends that the birth mother and the maternal grandmother interfered with his relationship with the child when the birth mother failed to return his telephone calls or to respond to the messages he left for her, including his message that he wanted to see the child. Likewise, he contends that the birth mother and the maternal grandmother interfered with his relationship with the child when they placed the child with the adoptive parents in Alabama without his knowledge, and that the adoptive parents interfered with his relationship with the child *1090 by seeking to have his legitimation process in Georgia dismissed and by refusing to allow him to visit the child.
With deference to the presumption of correctness afforded the probate court’s findings under the ore tenus rule, we hold that the probate court did not exceed its discretion when it concluded that the biological father “has not been prevented from maintaining a significant parental relationship with [the] minor child.”
Unlike Ex parte F.P., the biological father and the paternal grandmother here were not excluded when the birth mother was admitted to the hospital to give birth to the child. The biological father and the paternal grandmother were present at the hospital when the birth mother was admitted weeks before her due date because her condition necessitated immediate medical care. Indeed, the paternal grandmother took the birth mother to the hospital. Despite the biological father’s contention that she made him leave the hospital before the child’s birth and that she interfered with his relationship with the child, the probate court was warranted in drawing other inferences from the testimony elicited — inferences that must be presumed correct. The probate court could justifiably have viewed the maternal grandmother’s request that the biological father remain in the waiting room not as an attempt by the maternal grandmother to interfere with the biological father’s relationship with the child, but as a reasonable request, given the birth mother’s medical condition and the biological father’s apparent insensitivity by creating a party-like atmosphere in the birth mother’s hospital room. The maternal grandmother’s testimony that she went to the waiting room to update the biological father on the mother’s condition but that he was no longer at the hospital, her production of telephone bills documenting that she had called the biological father on his telephone, and the fact that she notified the biological father of the birth of the child, all suggest that he made the decision not to return to the hospital, rather than that anyone was interfering with his relationship with the child.
Unlike the father in Ex parte F.P., the biological father here did not file with the Putative Father Registry in either Alabama or Georgia. He did not initiate court proceedings at the child’s birth, despite his claims that he had been excluded from the birthing experience. He did not initiate any proceedings in mid- to late May 2003, when he concedes he learned that the other man had been excluded as the child’s father by DNA testing. Despite the fact that he did consult with an attorney following the child’s birth, he initiated no legal proceedings until after he was served with notice of the adoption.
It is uncontroverted that the biological father never went to the birth mother’s house in the three weeks following the birth of the child. He offered alternative reasons for not attempting to see the child: his lawyer advised him not to contact the birth mother so as to avoid potential harassment charges; the maternal grandmother had threatened him with legal ramifications if he did not leave the hospital, a contention that is refuted by the record; and he did not know if the birth mother was actually residing at her parents’ house. The probate court, in weighing the evidence and assessing the credibility of the witnesses — including the truthfulness of the biological father’s testimony— could have reasonably discredited his second and third reasons. As to the remaining reason, the biological father had access to legal remedies of which he did not avail himself. Despite the fact that the biological father had conferred with an attorney, his delay in initiating proceedings to have himself declared the legal father and consequently to be held legally and financially *1091 responsible to support the child, is in marked contrast with his swift access to the judicial system seven months earlier when he filed for a temporary restraining order within days of the birth mother’s decision to end their engagement.
To be clear in our holding, we note that this was not a circumstance in which the biological father testified that his delay in initiating legal proceedings was influenced by his lack of financial resources. To the contrary, the biological father testified that he was gainfully employed; that he had no substantial debt; and that he and his mother jointly owned their house.
Parents are rightfully entitled to a thorough judicial determination regarding their rights to their children. But the singular evidence of participation in court proceedings, without more, does not evidence a parent’s commitment to a child, nor does it singularly evidence a significant parental relationship.
The probate court did not exceed its discretion in resolving the conflicts in the testimony by discrediting the biological father’s version of the facts — that he provided prebirth support for the child and birth mother; that he prepared a nursery for the child in his house; and that he established a bank account for the child. The probate court did not exceed its discretion by accepting the birth mother’s version of the facts — that the biological father failed to provide support for her and the child before or after the child’s birth, that he was not present for the birth of the child and did not return to the hospital to visit her or the child; and that he did not telephone her for three weeks following the child’s birth.
When the biological father did ultimately reach the birth mother by telephone after the child’s birth, the birth mother’s evasiveness and her ultimate refusal to tell the biological father where the child was physically residing must be considered by the court in light of additional undisputed facts peculiar to this case. First, the paternal grandmother, with whom the biological father resided and with whom he jointly owned a house, had been convicted of the offense of interference with custody for fleeing the country with her children in violation of a court order. Parties to this proceeding were aware of that conviction. The birth mother testified that the biological father had once told her during the pregnancy, “if you try and take her from me, I will get her legally or illegally.” Secondly, the biological father indicated his failure to appreciate the significance of a legal proceeding when he initiated contact with the birth mother after he had secured a temporary restraining order against her.
Finally, the birth mother’s evasiveness becomes less relevant when considered in light of the biological father’s own conflicting testimony regarding requests he made to visit the child. Initially, the biological father testified that he requested to be allowed to visit the child on “numerous” occasions. When pressed for the dates and times of those requests, he testified as to only one occasion when he specifically requested of the adoptive parents that he be allowed to visit the child. That request was made at Christmastime when the child was 7 1/2 months old and the adoption proceeding had been pending for five months. The significance of the biological father’s lack of contact with or inquiries about the child is heightened, given the child’s medical condition at birth. The biological father’s attorney testified that she relayed to her client the child’s condition. Specifically, she recalled telling the biological father that the child’s head “seemed to be misshaped and that [the child may have] neurological problems.” While the biological father professed his desire to have custody of his child despite the child’s health problems, the evidence *1092 indicating that he did not inquire about the child’s health is telling.
The Court of Civil Appeals’ opinion, authored by Presiding Judge Crawley, held that “there is no principled distinction between this case and Ex parte F.P.” K.W.J., 933 So.2d at 1079. We, however, conclude that the facts in the present case are distinguishable from the facts in Ex parte F.P. The facts in the present case do not provide a justifiable excuse for the biological father’s behavior, which constitutes implied consent.
After considering the record in this case and the main opinion of the Court of Civil Appeals, we agree with the views expressed by Judge Murdock in his well-written dissent:
“Despite the formal legal position taken in this case by the biological father, the trial court found that the father’s subsequent acts and omissions spoke louder than his words, and implied the necessary consent under the Adoption Code [§ 26-10A-1 et seq., Ala.Code 1975]. This is a difficult case. Given the conflicting evidence and the ore tenus presumption, however, I have not been persuaded that this court should overturn the trial court’s judgment in this case.
“We should not equate the filing of ‘court papers’ and the taking of legal positions with the establishment of human relationships. A child can be abandoned just as surely when papers have been filed with a court as when they have not been. While those papers sit in a folder in a courthouse, children grow. They are read to and tucked in at night. They are nursed to health. They are taught. They are nurtured. They are loved. And they love back. And bonds are formed — but not with a biological father who has allowed himself to remain absent from the child’s life. See generally R.K. v. R.J., 843 So.2d 774 [ (Ala.Civ.App.2002) ]; Lehr v. Robertson, 463 U.S. 248 [ (1982) ].’ ”
K.W.J., 933 So.2d at 1080-81 (Murdock, J„ dissenting) (footnote omitted).[1]

Conclusion

The probate court’s judgment granting the adoption and denying the biological father’s contest to the adoption proceeding, based on ore tenus testimony and therefore presumed correct, is supported by the evidence. The decision of the Court of Civil Appeals is therefore reversed, and a judgment is rendered in favor of the adoptive parents.
REVERSED AND JUDGMENT RENDERED.
NABERS, C.J., and HARWOOD, STUART, and BOLIN, JJ., concur.
SEE, LYONS, WOODALL, and PARKER, JJ., concur in the result.

. In light of our holding, we pretermit discussion of the Court of Civil Appeals' ruling that custody of the child be placed with the birth mother, without the benefit of a custody determination by a trial court.