PER CURIAM.
The Alabama Department of Human Resources (“DHR”) appeals from the Jefferson Probate Court’s judgment granting B.V. and D.V.’s petition to adopt J.C. We affirm.
J.C. was born on August 19, 1989, with multiple medical problems, including partial trisomy 18,[1] and he was later diagnosed as also suffering from mental retardation and autism. Shortly after J.C.’s birth, the Macon County Department of Human Resources (“the Macon County DHR”)[2] acquired custody of J.C. based on dependency proceedings filed in the Macon Juvenile Court, and, on November 21, 1990, the Macon County DHR placed J.C. in the home of B.V. and D.V., who were licensed foster parents. For the next 18 years, except for a 20-month period when J.C. was placed in a residential facility, J.C. remained in the home of B.V. and D.V. The Macon County DHR retained custody of J.C. during that period. It is undisputed that, at present, J.C. has an IQ in the low 30s and that he functions on the level of a 2-year-old child.
In 2003, B.V. and D.V. moved to Hoover and enrolled J.C. in public school there. Although J.C. attended only the first few months of the 2003-2004 school year in the Hoover public schools, he attended Hoover High School throughout all the 2004-2005, 2005-2006, and 2006-2007 school years. J.C. attended Hoover High School during the 2007-2008 school year until, on February 22, 2008, DHR summarily removed him from B.V. and D.V.’s home and placed him in The Learning Tree, a residential-care facility.[3]
On August 20, 2008, the day after J.C. reached 19 years of age, B.V. and D.V. filed in the Jefferson Probate Court a petition to adopt J.C., who they described as a mentally retarded and permanently and totally disabled adult. At that time, no guardianship or conservatorship proceeding had been initiated concerning J.C. On August 21, 2008, the Jefferson Probate Court appointed a guardian ad litem for *703 J.C. and entered an interlocutory order awarding custody of J.C. to B.V. and D.V.
On September 15, 2008, the Jefferson Probate Court granted a petition filed by DHR to intervene in the adoption proceedings. DHR thereafter filed a contest to the adoption and moved to transfer the proceedings to the Macon Juvenile Court. On October 14, 2008, S.C., J.C.’s maternal grandmother, filed a motion to intervene, along with a motion to transfer and a contest to the adoption, tracking the language of DHR’s filings. The Jefferson Probate Court denied S.C.’s motions and contest that same date. On October- 30, 2008, Linda W. Henderson, an .attorney previously appointed as the guardian ad litem for J.C. by the Macon Juvenile Court, filed a notice of appearance in the Jefferson Probate Court and joined in DHR’s adoption contest and in its pending motion to transfer. The Jefferson Probate Court denied the motion to transfer on December 4, 2008.
In April 2009, S.C. filed a petition for letters of guardianship in the Macon Probate Court. The Macon Probate Court subsequently issued letters of guardianship to S.C. on May 1, 2009, after which S.C. again moved to intervene in the adoption proceedings and renewed her adoption contest and her motion to transfer the proceedings to the Macon Juvenile Court. On May 18, 2009, B.V. and D.V. filed a motion to vacate or to revoke the order granting letters of guardianship to S.C., which the Macon Probate Court granted on May 26, 2009, simultaneously transferring the case to the Jefferson Probate Court. On May 29, 2009, the Macon Probate Court purported to reinstate the letters of guardianship on the basis that B.V. and D.V. had not had standing to file their motion to reconsider the Macon Probate Court’s original order granting letters of guardianship to S.C.
Meanwhile, the Jefferson Probate Court commenced a trial on the adoption petition and the contests to that petition on May 6, 2009, which continued on May 7, 2009. On that date, N.C., the natural mother of J.C., filed in the Jefferson Probate Court an adoption contest and a motion to transfer the. action to the Macon Juvenile Court. The Jefferson Probate Court recessed the trial. During the recess, Henderson, the guardian ad litem appointed by the Macón Juvenile Court, filed a report recommending that B.V. and D.V.’s petition for- adoption be denied. The trial concluded on May 29, 2009.
At the trial, Willie Huff, owner of Huff Industries, testified that DHR had hired his company to provide transportation services for J..C.’s visitation with S.C. from 2006 to 2008. , At the time his company provided those services, J.C. lived with B.V. and D.V. and attended Hoover High School. He testified that he had observed J.C. in the classroom and that he had seen J.C. hit. his teacher a couple of times and spit at.her, although he had not observed J-.C. acting aggressively .toward anyone else-at,the school. He had also observed J.C. iri the -home acting aggressively toward B.V. and D.V., although he testified that it had appeared that J.C. was being aggressive in order to gain their attention rather-than in a mean-spirited way. He testified that J.C. had never been aggressive with him. Huff testified that, during the time he had worked with J.C., J.C. had visited S.C. every other weekend. He testified that, although B.V. and D.V. .tended to take care of J.C.’s hygienic needs for him, S.C. tended to help J.C. take care of his hygienic needs for himself. Huff testified that, during the two years he had worked with J.C., J.C. had gained weight and that that weight gain had caused J.C. to develop breathing problems. He testi- *704 fíed that B.V. and D.V.’s care of J.C. was good.
Ann Boyd testified that she had worked as a quality-assurance reviewer for DHR and that, in February 2006, she had been assigned to review J.C.’s case. She testified that she had performed that review over a three-day period, reviewing records and visiting with and interviewing numerous individuals involved with J.C.’s care. She testified that she had concluded, based on her review, that she had concerns about the appropriateness of J.C.’s placement in foster care at that time. She testified that she had been concerned that J.C. was not making progress in terms of his communication and his self-help skills and that he was not making progress in school. She testified that she had been concerned that it took what she considered an inordinate number of people to control J.C.’s behavior. She testified that J.C. did not have social skills and that he tended to intrude into others’ personal space. She stated that he was not able to socialize with other children at school and that behavior aids were in B.V. and D.V.’s home 70 hours per week. She indicated that B.V. and D.V. tended to use rewards of food, such as cake icing, peanut butter, and french fries, to control J.C.’s behavior. She stated that her observations of J.C. in B.V. and D.V.’s home were that he was being catered to rather than being taught self-help or communication skills.
Dr. Toren Anderson, a pediatrician, testified that B.V. began taking J.C. to him for routine checkups in 2003. He testified that J.C.’s weight had always been a major issue and that B.V. and D.V. had often discussed it with him. Dr. Anderson testified that, because of J.C.’s bone structure, he was bound to be a large person. He testified that J.C.’s medical issues were magnified by a medicine he was taking that increased his appetite. He testified that B.V. and D.V. ate appropriate foods and lived an active lifestyle. He testified that J.C. had a voracious appetite and that, to his knowledge, there was nothing B.V. and D.V. could have done that would have ameliorated J.C.’s weight issue. He stated that, in his opinion, B.V. and D.V. had done an outstanding job of caring for J.C. and that J.C.’s weight problem had more to with genetics and medication than it did with eating too many sweets.
Paula Manning, a registered nurse and the coordinator of medical services at The Learning Tree facility at which J.C. had been placed in 2008, testified that, when J.C. arrived at The Learning Tree, he was obese; he was unable to rise from a seated position in a chair by himself, and he was unable to climb stairs without losing his breath. She testified that he was put on a special diet at The Learning Tree consisting of low-fat foods, sugar-free drinks, and healthy snacks. She testified that J.C. had weighed 337 pounds when he had arrived at The Learning Tree but that, since that time, he had lost 89 pounds. She testified that he could now climb stairs without losing his breath and that he could now rise from a seated position.
Dr. James Williams, The Learning Tree’s campus supervisor for the campus at which J.C. had been placed, testified that J.C. exhibited uncooperative behavior, although his behavior had improved since arriving at The Learning Tree. He stated that J.C. had made progress in learning to bathe himself and that J.C.’s personal hygiene was improving. Dr. Williams admitted that the teachers at The Learning Tree campus at which J.C. had been placed were not certified special-education teachers. He testified that, approximately once every month, J.C.’s behavior became such that he had to be restrained by being placed in a prone position on the floor with two people holding him down.
*705 Dr. Barbara Mayer, the director of instructional-support services for Hoover city schools, testified that J.C. had attended Hoover city schools from August 2003 until his removal by DHR in February 2008. Dr. Mayer testified that, early in the 2008-2004 school year, J.C. had injured his teacher’s eye and that the injury had required medical treatment at an emergency room. He later injured the same teacher again. In early October 2003, J.C. punched or kicked an autism specialist in the lower abdomen, causing a hematoma for which the specialist required surgery. Dr. Mayer testified that, after injuring those individuals, J.C. was removed from Hoover schools and was educated in B.V. and D.V.’s home. She stated that the next school year he returned to Hoover High School, where he was placed in a classroom by himself. Dr. Mayer testified that, at times, J.C. would smell of urine or feces when he came to school and that he had a tendency to destroy property in the classroom. She testified that, during J.C.’s last couple of years at the high school, he was transported to and from the school by bus. She stated that he was the only student who rode that bus and that three or four adults rode with him. She testified that there were numerous incidents on the bus involving J.C. pinching, hitting, spitting, and grabbing. She testified that removing J.C. from the bus was always a challenge and that, often, the process of removing him from the bus and taking him to his classroom would take as long as an hour. Dr. Mayer testified that J.C. had not made significant progress while in the Hoover school system.
Gurushadad Khalsa, a certified special-education teacher who served as J.C.’s teacher at Hoover High School during the 2006-2007 and 2007-2008 school years, testified that J.C. had made substantial progress ■ during the two years that she had taught him. She testified that it had been noted on his last individualized-education-program report before being removed from B.V. and D.V.’s home that he was able to sort, match, package, file, and assemble. She testified that, ■ although J.C. was in a classroom by himself, several of his peers would come into the classroom throughout the day to spend time with him and to give him the opportunity for social interaction. According to Khalsa, J.C. was social, loved people, and was happy to see his peers when they visited with him. She testified that, at first, J.C. was not able to have people in close proximity to him, but, she testified, by the second year that she taught him, he had progressed to the point that his peers could sit next to him. She testified that several of the peers who had visited J.C. had developed strong relationships with him. She testified that J.C.’s behavior had improved substantially over the time she was his teacher. Khalsa testified that J.C. had attended the high-school prom one year. She stated that, although there were safety concerns regarding placing J.C. in a classroom with other students, those concerns had diminished substantially over time. She testified that J.C. had never been restrained by being placed on the ground in a prone position while he had attended Hoover High School.
D.V., the foster father, testified that he works as an electrical engineer for an automobile-manufacturing company. He testified that he had known J.C. since J.C. was 8 months old, and he stated that J.C. had “been his son” since J.C. was 15 months old. He testified that, when J.C. was placed in their home, J.C. had not yet been diagnosed with mental retardation or autism. He testified that, when J.C. was diagnosed with autism at age four or five, that diagnosis did not change his and his ■wife’s desire to care and provide for J.C. He testified that there was not much in *706 volvement from DHR during J.C.’s early years.
D.V. testified that it had never been his desire for N.C. and S.C. not to be a part of J.C.’s life. He testified that he had invited them to B.V. and D.V.’s home, and he had invited them, after their visits with J.C., to have a meal with them at ■ a restaurant. D.V. testified that there were times when DHR would not provide transportation to take J.C. to S.C.’s house for visitation and that B.V. and he would drive J.C. to Tuskegee themselves, a four-hour drive, for that visitation. D.V. stated that he once expressed frustration that it appeared that B.V. and he were the only ones who wanted to ensure that J.C. was able to visit with S.C. because they were not receiving any support from DHR or S.C. to make sure the visitation occurred.
D.V. testified that Dr. Mayer’s conduct while J.C. was in the Hoover city schools caused B.V. and him to initiate a “due-process” proceeding regarding J.C.’s education there. D.V. testified that B.V. and he prevailed in that due-process proceeding and that, as a result, J.C. was able to continue being educated at Hoover High School.
D.V. stated that he did not know that J.C. was going to be removed from B.V. and his home on the morning of February 22, 2008. D.V. testified that B.V. and he had not been allowed to have contact with J.C. since- he was taken to The Learning Tree and that all their mail to him had been returned.
D.V. testified that he recognized that, throughout J.C.’s remaining life, J.C.’s needs would change periodically, and he stated that he believed that B.V. and he were in the best position to make decisions for J.C. He testified that he would not be petitioning to adopt J.C. if anyone else throughout J.C.’s life had shown the dedication to make decisions for J.C.
D.V. testified that he and B.V. had an active family life and that they would often take their family, including J.C., places. He testified that J.C. attended church with them.
D.V. testified that he had never had to restrain J.C. by placing him in a prone position on the floor and holding him down. He testified that he views J.C. as a son and that J.C. knows him as a father. D.V. testified that, if it came to a point when it appeared J.C. needed to be placed in an institution, he would be able to have J.C. placed there.
B.V., the foster mother, testified that she wanted to continue to serve as J.C.’s mother. She testified that J.C. performed some functional tasks in the home, such as working with the washing machine and the dryer. She also testified that J.C. had participated in the Special Olympics.
Following the trial, DHR moved to dismiss the adoption petition, and the guardian ad litem appointed by the Jefferson Probate Court filed a consent to the adoption. On July 28, 2009, the Jefferson Probate Court entered a final judgment approving the adoption. In that judgment, the Jefferson Probate Court dismissed the contest filed by S.C. because it concluded that S.C. had no standing. The Jefferson Probate Court denied the contest filed by DHR because it concluded that DHR had failed to prove that the adoption was not in the best interests of J.C. . The Jefferson Probate Court wrote:
“The testimony taken has proven to this Court that it is in the best interest of [J.C.] to have the adoption go forward. [B.V. and D.V.] have been the constant in [J.C.j’s life and have shown a genuine love for him. He was part of their family for nearly 18 years and it is evident that there is a parent-child bond between [J.C.] and [B.V. and D.V.]. *707 [B.V. and D.V.] presented evidence that they are prepared for [J.C.]’s special needs as he grows into adulthood. This court is convinced through the evidence that it is in the best interest of [J.C.] for this Petition of Adoption to be Granted.”
The Jefferson Probate Court did not expressly rule on the contest filed by Henderson, the guardian ad litem appointed by the Macon Juvenile Court, but it impliedly denied that contest by approving the adoption petition. DHR appeals.
The standard by which this court reviews the judgment of a probate court granting an adoption petition is well settled:
“ “Where a probate court hears ore tenus evidence on a petition for adoption, its findings and conclusions based on that evidence are presumed to be correct.’ K.P. v. G.C., 870 So.2d 751, 757 (Ala.Civ.App.2008). The ore tenus presumption of correctness arises because the trial court is in a position to observe the demeanor and behavior of the witnesses and is thus able to evaluate whether their testimony is credible and truthful. Ex parte Fann, 810 So.2d 631, 633 (Ala.2001); Ex parte Bryowsky, 676 So.2d 1322, 1324 (Ala.1996). The trial court is able to make personal observations of the witnesses, while an appellate court has the benefit only of a cold transcript of the proceedings. Thus, neither this Court nor the Court of Civil Appeals may reweigh the evidence or sit in judgment of disputed evidence presented ore tenus, Ex parte Bryowsky, 676 Solid at 1324-26, and the trial court’s judgment based on ore ten-us evidence will not be disturbed unless it is palpably wrong, manifestly unjust, or without supporting evidence. Samek v. Sanders, 788 So.2d 872, 876 (Ala.2000).”
Ex parte J.W.B., 933 So.2d 1081, 1087 (Ala.2005).
DHR contends that the adoption proceeding should have been transferred to the -Macon Juvenile Court because, it argues, venue was not proper in the Jefferson Probate Court. Section 26-10A-4, Ala.Code 1975, provides that venue for an adoption petition is proper in the county in. which the person to be.adopted resides, in the county in which a petitioner resides, or in the county in which an office of an agency having custody or guardianship of the person to be adopted is located. In the present case, both the petitioners, B.V. and D.V., reside in Jefferson County. Thus, venue was proper in the Jefferson Probate Court. Citing § 26-10A-24(e), Ala.Code 1975, DHR points out that “a contested adoption hearing may be transferred to the court having jurisdiction over juvenile matters.” However, simply because a probate court “may” transfer a case to a juvenile court does not mean that it “must” do so. DHR’s contention is without merit.
, DHR next contends that the Jefferson Probate Court erred when, on August 21, 2008, it entered an interlocutory order awarding custody of J.C. to B.V. and D.V. pursuant to § 26-10A-18. However, we need not determine whether the Jefferson Probate Court erred when it entered that interlocutory order awarding custody of J.C. to B.V. and D.V. because that order became moot at the time the Jefferson Probate Court entered the final judgment granting B.V. and D.V.’s petition to adopt J.C. See Ex parte A.M.P., 997 So.2d 1008, 1015 (Ala.2008) (“Once the final order of adoption is entered, the interlocutory order becomes moot.”).
DHR next contends that its consent to' the adoption, as well as that of N.C., J.C.’s mother, were necessary and that, because neither consented, the Jef *708 ferson Probate Court was precluded from granting B.V. and D.V.’s adoption petition. DHR relies on § 26-10A-7, which, in pertinent part, provides:
“(a) Consent to the petitioner’s adoption or relinquishment for adoption to the Department of Human Resources or a licensed child placing agency shall be required of the following:
“(1) The adoptee, if 14 years of age or older, except where the court finds that the adoptee does not have the mental capacity to give consent;
“(2) The adoptee’s mother;
[[Image here]]
“(4) The agency to which the adop-tee has been relinquished or which holds permanent custody and which has placed the adoptee for adoption, except that the court may grant the adoption without the consent of the agency if the adoption is in the best interests of the adoptee and there is a finding that the agency has unreasonably withheld its consent; and
“(5) The putative father if made known by the mother or is otherwise made known to the court provided he complies with Section 26-10C-1 and he responds within 80 days to the notice he receives under Section 26-10A-17(a)(10).
“(b) A petition to adopt an adult may be granted only if written consent to adopt has been executed by the adult seeking to adopt and his or her spouse or by the guardian or conservator of the adult sought to be adopted pursuant to the requirements of Sections 26-10A-6 and 26-10A-11.”
Although § 26-10A-7 purports to apply to all adoption proceedings, a more narrow provision regarding necessary consents and applying only to adult adoptions appears in § 26-10A-ll(b). That section reads:
“When the person sought to be adopted is an adult, only the sworn, written consent of the adult person sought to be adopted shall be required and no order of reference or any home studies need be issued. If the adult person to be adopted has been adjudicated incompetent, the written consent of the adult person’s guardian or conservator shall be required. If the adult person is without a spouse, guardian, or conservator and the court has reason to believe that the adult person is incompetent to give consent, the court shall appoint a guardian ad litem who shall investigate the adult person’s circumstances and that guardian ad litem shall give or withhold consent. The guardian ad li-tem shall file a written report stating the basis for the decision and the court shall afford a hearing to all parties to present evidence as to the best interest of the adult person, and if the court determines upon clear and convincing evidence that the decision to withhold consent by the guardian ad litem is arbitrary and is not in the best interests of the incompetent adult person, it may proceed to make any other orders it deems necessary for the adult person’s welfare, including granting the petition for adoption.”
(Emphasis added.) It is a well settled rule of statutory construction that “[w]here statutes in pari materia are general and specific, the more specific statute controls the more general statute.” Crawford v. Springle, 631 So.2d 880, 882 (Ala.1993). Thus, although the general statutory provision relative to adoption proceedings would require in the present case that DHR and J.C.’s mother consent to J.C.’s adoption by B.V. and D.V., the more specific statutory provision found in § 26-10A-ll(b) that applies only to adult adoptions controls this case and provides that *709 only the consent of J.C.’s guardian ad li-tem was required for the adoption. The guardian ad litem appointed by the Jefferson Probate Court provided that consent.
DHR makes a single-sentence, passing reference to the fact that the Macon Probate Court appointed S.C. as J.C.’s guardian and, as a result, that she had standing to oppose J.C.’s adoption. The Jefferson Probate Court determined that S.C. was without standing to oppose J.C.’s adoption, and, based on certain discussions at trial, it appears that the Jefferson Probate Court found that S.C. had not been properly appointed J.C.’s guardian. S.C. did not appeal the Jefferson Probate Court’s conclusion in this regard. DHR, which was unaffected by the Jefferson Probate Court’s conclusion as to S.C.’s rights, is without standing to assert S.C.’s purported rights as J.C.’s guardian. See Ex parte Izundu, 568 So.2d 771, 772 (Ala.1990) (holding that a litigant may not claim standing to assert the rights of a third party). The Jefferson Probate Court’s conclusion that S.C. lacked standing having remained unchallenged by any party with standing to assert such a challenge, we cannot reverse the judgment on the basis that S.C. was required to consent to J.C.’s adoption.
DHR contends that the Jefferson Probate Court erred in entering a final judgment when, it argues, the necessary pre- and post-placement investigations had not been conducted. DHR argues that such investigations are required and that a final order granting an adoption petition cannot be entered until such investigations are completed. However, in the case of an adult adoption such as in the present case, such investigations are not required. See § 26-10A-11(b) (“When the person sought to be adopted is an adult, ... no order of reference or any home studies need be issued.”).
Finally, DHR contends that several of the prerequisites necessary to the granting of B.V. and D.V.’s petition at the disposi-tional hearing were not met. DHR relies on § 26-10A-25(b), which provides:
“At the dispositional hearing, the court shall grant a final decree of adoption if it finds on clear and convincing evidence that:
“(1) The adoptee has been in the actual physical custody of the petitioners for a period óf 60 days, unless for good cause shown, this requirement is waived by the court;
“(2) All necessary consents, relin-quishments, terminations, or waivers have been obtained and, if appropriate, have been filed with the court;
“(3) Service of the notice of pen-dency of the adoption proceeding has been made or dispensed with as to all persons entitled to receive notice under Section 26-10A-17;
“(4) All contests brought under Section 26-10A-24 have been resolved in favor of the petitioner;
“(5) That each petitioner is a suitable adopting parent and desires to establish a parent and child relationship between himself or herself and the adoptee;
“(6) That the best interests of the adoptee are served by the adoption; and
“(7) All other requirements of this chapter have been met.”
DHR argues that there is no evidence indicating that the first, second, fifth, and sixth requirements were met in this case.
As to the first requirement, no party contended at trial that the Jefferson Probate Court should not grant B.V. and D.V.’s adoption petition on the basis that J.C. had not been in B.V. and D.V.’s physical custody for 60 days prior to the hear *710 ing. As such, DHR is making this argument for the first time on appeal, and we will not entertain it. See Andrews v. Merritt Oil Co., 612 So.2d 409, 410 (Ala.1992) (“This Court cannot consider arguments raised for the first time on appeal; rather, our review is restricted to the evidence and arguments considered by the trial court.”).
As to the second requirement, that all the necessary consents be obtained, we have already concluded that the only consent necessary to the adoption in this case was that of J.C.’s guardian ad litem appointed by the Jefferson Probate Court for the purpose of the adoption petition. Thus, we conclude that the second requirement was satisfied.
As to the fifth requirement, we conclude that the record contains substantial evidence supporting the Jefferson Probate Court’s determination that B.V. and D.V. were suitable adopting parents and that each already had developed a parent-child relationship with J.C., having had physical custody of J.C. for almost all J.C.’s life and having treated J.C. as their son during that time.
Finally, as to the sixth requirement, we conclude that the record contains substantial evidence supporting the Jefferson Probate Court’s determination that B.V. and D.V.’s adoption of J.C. was in J.C.’s best interests. Without recounting all the evidence set forth previously in this opinion, we note that J.C. has lived almost his entire life with B.V. and D.V., and, as just stated, there was testimony demonstrating that he had an established parent-child relationship with them. In addition, the record contains evidence indicating that J.C. was making educational progress at Hoover High School and that, while he was in the home of B.V. and D.V., he was able to participate in activities as a member of their family. There was evidence indicating that he had formed strong relationships with individuals at Hoover High School, and there was evidence indicating that the weight he had gained while in the custody and care of B.V. and D.V. related to certain medication he was taking and his genetics rather than an inappropriate diet.[4]
To be sure, there was evidence, especially related to J.C.’s weight gain and social and educational advancement, that contradicted the testimony offered by B.V. and D.V. However, it is not the job of this court to reweigh the evidence presented to the Jefferson Probate Court ore tenus, nor is it this court’s function to substitute its view of the evidence for that of the Jefferson Probate Court. See Ex parte J.W.B., 933 So.2d at 1087. Our review of the record leads us to conclude that the Jefferson Probate Court had before it substantial evidence demonstrating that it was in J.C.’s best interest for B.V. and D.V. to adopt him, and, as a result, DHR’s contrary contention is without merit.
Based on the foregoing, we conclude that DHR has failed to provide this court *711 with any ground on which to reverse the Jefferson Probate Court’s judgment. As a result, that judgment is due to be, and is hereby, affirmed.
AFFIRMED.
All the judges concur.

. Trisomy 18 is a genetic abnormality caused by the presence of extra genetic material on the 18th chromosome.

. Although DHR litigated this action, the Macon County DHR was the department initially involved with J.C. The county departments of human resources are state agencies. See Ex parte Department of Human Res., 716 So.2d 717, 718 (Ala.Civ.App.1998).
"The county departments of human resources serve as agents of the State Department of Human Resources; the State Department is empowered to designate the county as its agent and to assist the counties in their various duties when necessary. See § 38-6-2, Ala.Code 1975; Admin. Rules 660-1-2-.01(g) and 660-1-2-.02.”
State Dep’t of Human Res. v. Estate of Harris, 857 So.2d 818, 819 n. 1 (Ala.Civ.App.2002).

.The manner of the removal was made the subject of litigation before the Macon Juvenile Court, see B.V. v. Macon County Dep’t of Human Res., 14 So.3d 171 (Ala.Civ.App.2009), and the Montgomery Circuit Court, see B.V. v. Davidson, [Ms. 2081125, June 25, 2010] — So.3d - (Ala.Civ.App.2010).

. As part of their "best-interest” argument, DHR states that B.V. and D.V., in their foster-care agreement with the Macon County DHR, agreed not to seek the adoption of J.C. without DHR’s written consent. DHR provides no legal authority indicating that such an agreement is binding on the parties or should influence, in any way, the probate court's determination as to whether it should grant B.V. and D.V.'s petition to adopt J.C. Because DHR cites no legal authority in support of its argument, we will not consider it. See White Sands Group, L.L.C. v. PRS II, LLC, 998 So.2d 1042, 1058 (Ala.2008) ("Rule 28(a)(10)[, Ala. R.App. P.,] requires that arguments in briefs contain discussions of facts and relevant legal authorities that support the party’s position. If they do not, the arguments are waived.").