THOMAS, Judge.
This is the eighth time these parties-W.L.K. ("the father") and T.C.M. and C.N.M. ("the prospective adoptive parents")-have appeared before this court seeking review of one or another court's orders respecting the custody of M.M. ("the child"). See Ex parte W.L.K., 175 So.3d 652 (Ala. Civ. App. 2015) (plurality opinion) (" W.L.K. I"); T.C.M. v. W.L.K. (No. 2130936, February 27, 2015), 206 So.3d 593 (Ala. Civ. App. 2015) (table) (appeal dismissed); Ex parte T.C.M. (No. 2140717, June 30, 2015), 212 So.3d 241 (Ala. Civ. App. 2015) (table) (petition denied); Ex parte W.L.K., 222 So.3d 357 (Ala. Civ. App. 2015) (" W.L.K. II") (ordering the Jefferson Probate Court to enter an order dismissing the adoption action in compliance with W.L.K. I ); T.C.M. v. W.L.K., 208 So.3d 39 (Ala. Civ. App. 2016) (" T.C.M. II") (determining that the Jefferson Juvenile Court could not enter a pickup order directing that the child be removed from the custody of the prospective adoptive parents); Ex parte T.C.M. (No. 2150935, September 16, 2016), 231 So. 3d 330 (Ala. Civ. App. 2016) (table) (petition dismissed as moot); and T.C.M. v. W.L.K., 237 So.3d 238 (Ala. Civ. App. 2017) (released today).
*3 The Facts and Procedural History
The basic procedural history underlying these appeals was set out in W.L.K. I, 175 So.3d at 654-55 :
"[The father] and S.F. ('the mother') were involved in a relationship between April and July 2012; they lived together in the father's house in Middleburg, Florida, during that period. The mother became pregnant early in the relationship, and she and the father had begun preparing for the baby by purchasing baby items. However, the mother left the father in July 2012, and, after she broke into the father's house and stole several items, the father swore out a warrant against her. The mother was arrested, and, after that, the father lost contact with her. In December 2012, the father, who is in the United States Navy, contacted an attorney in the Judge Advocate General about his situation; that attorney referred the father to a nonmilitary attorney, who assisted the father by instituting a paternity and custody action in a Florida court in January 2013. The father registered with the putative father registry in Florida. The father attempted to locate the mother at nearby hospitals on January 18, 2013, the expected date of delivery. However, the father was unable to locate the mother.
"On January 9, 2013, the mother gave birth to [the child] in Montgomery, Alabama. The mother had consented to an adoption of the child by [the prospective adoptive parents], who were present at the birth and who took the child home from the hospital. On January 29, 2013, the prospective adoptive parents filed a petition to adopt the child in the Jefferson Probate Court.
"The father first learned of the birth of the child in Alabama on March 1, 2013. After he was served with an amended petition to adopt the child on March 25, 2013, and upon the advice of his Florida counsel, the father sought legal counsel in Alabama. He filed a contest to the adoption petition and a motion to dismiss the adoption petition on April 11, 2013.
"As required by Ala. Code 1975, § 26-10A-24(a), the probate court held a contested hearing on the father's contest to the adoption petition on September 26, 2013. At issue was whether the father had impliedly consented to the child's adoption pursuant to the theory of 'prebirth abandonment,' under which consent to an adoption may be implied based on abandonment if a father fails, 'with reasonable knowledge of the pregnancy, to offer financial and/or emotional support for a period of six months prior to the birth.' Ala. Code 1975, § 26-10A-9(a)(1). After hearing the testimony of the father and T.C.M., the probate court entered an order on March 19, 2014, concluding that the father had not impliedly consented to the adoption and specifically rejecting the contention that the father's conduct had amounted to an abandonment of the mother during her pregnancy."
This court determined in W.L.K. I that the probate court had been required by Ala. Code 1975, § 26-10A-24(d), to dismiss the prospective adoptive parents' adoption petition after it had decided the father's adoption contest in his favor. 175 So.3d at 659. After the resolution of the father's first petition for the writ of mandamus in W.L.K. I, the probate court failed to enter a judgment dismissing the prospective adoptive parents' adoption petition, so the father filed a second petition for the writ of mandamus to compel the probate court to do so. W.L.K. II, 222 So. 3d at 358. This court ordered the probate court to enter a judgment awarding the prospective *4 adoptive parents reimbursement for the costs of caring for the child in compliance with W.L.K. I and § 26-10A-24(d), id. at 360-, which the probate court did on October, 3, 2016, after the prospective adoptive parents' petition for the writ of certiorari in W.L.K. II was denied by the Alabama Supreme Court. See Ex parte T.C.M., 222 So. 3d 360 (Ala. 2016). The prospective adoptive parents have appealed the October 3, 2016, judgment, arguing that the probate court erred by not concluding that the father's consent to the adoption was irrevocably implied under Ala. Code 1975, § 26-10A-9(a)(5), by his failure to register with the Alabama Putative Father Registry, codified at Ala. Code 1975, § 26-10C-1, and that the evidence does not support the probate court's conclusion that the father did not abandon the child under § 26-10A-9(a)(1). The father has filed a cross-appeal of the probate court's October 3, 2016, judgment, seeking its reversal insofar as it assessed against him one-half of the $4,200 guardian ad litem fee and "all additional costs of court" related to the action.[1]
In its judgment, the probate court recounted the history of the parents' brief relationship. The probate court found that the father and the mother had begun planning for the arrival of the child after they learned of the mother's pregnancy. The probate court found that the father was unaware of the mother's reasons for leaving the home they shared on July 5, 2012, but commented that the parties had had an argument about the mother's smoking during her pregnancy. The probate court recounted that the father had discovered that the mother had broken into the house and stolen some of his property and that, as a result, the mother was arrested.
The probate court found that the father had not had contact information for the mother after her arrest and that he had taken legal steps to safeguard his parental rights, including seeking advice from the Judge Advocate General, who referred him to a nonmilitary attorney, who instituted a paternity and custody action on the father's behalf. The probate court also found that the father had registered with the Florida Putative Father Registry. The probate court noted that the father had learned that the mother had been planning to have the child adopted by a couple from *5 New York. In addition, the probate court found that the father, once he learned of the child's birth in Alabama and the pending adoption proceeding, had registered with the Alabama Putative Father Registry and had contacted the prospective adoptive parents to seek visitation with the child. Based on the testimony and documentary evidence, the probate court concluded that the father had not impliedly consented to the adoption of the child.
The Prospective Adoptive Parents' Appeal
The prospective adoptive parents first argue that the father's failure to timely register with the Alabama Putative Father Registry resulted in his irrevocable implied consent to the adoption under § 26-10A-9(a)(5) and Ala. Code 1975, § 26-10C-1(i), and, thus, that his consent to the adoption was not required under Ala. Code 1975, § 26-10A-7(a)(5). The prospective adoptive parents rely on the general rule that adoption statutes require strict adherence to their requirements. See Anderson v. Hetherinton, 560 So.2d 1078, 1079-80 (Ala. Civ. App. 1990). They further contend, without citation to authority, that "there is no provision ... for substantial compliance" with the Alabama Putative Father Registry.
The probate court did not expressly decide any issue related to the application of § 26-10A-7(a)(5), § 26-10A-9(a)(5), or § 26-10C-1 in its judgment. Instead, it appears that the probate court either determined that the father's registration with the Florida Putative Father Registry was substantial compliance with the requirement that the father register with the Alabama Putative Father Registry or that Florida law should control the determination of whether the father's consent was required, both of which potential legal bases were argued to the probate court. The prospective adoptive parents do not provide this court with caselaw or other legal authority regarding either of those potential bases for the probate court's judgment, and we are not required to do their research on those issues. See Legal Sys., Inc. v. Hoover, 619 So.2d 930, 932 (Ala. Civ. App. 1993) ("It is not the duty nor function of an appellate court to perform a party's legal research."). Accordingly, we will not further consider the issue whether the father's failure to timely register with the Alabama Putative Father Registry should be fatal to his contest of the adoption.
We turn now to the prospective adoptive parents' argument that the evidence presented does not support the probate court's conclusion that the father did not abandon the child under § 26-10A-9(a)(1). The prospective adoptive parents contend that the evidence presented at trial established that the father "with reasonable knowledge of the pregnancy, [failed] to offer financial and/or emotional support for a period of six months prior to the birth." We first note that the probate court considered ore tenus evidence in making its decision and that, as a result, our standard of review requires that we give deference to that court's factual findings. Ex parte J.W.B., 933 So.2d 1081, 1087 (Ala. 2005).
" 'Where a probate court hears ore tenus evidence on a petition for adoption, its findings and conclusions based on that evidence are presumed to be correct.' K.P. v. G.C., 870 So.2d 751, 757 (Ala. Civ. App. 2003). The ore tenus presumption of correctness arises because the trial court is in a position to observe the demeanor and behavior of the witnesses and is thus able to evaluate whether their testimony is credible and truthful. Ex parte Fann, 810 So.2d 631, 633 (Ala. 2001) ; Ex parte Bryowsky, 676 So.2d 1322, 1324 (Ala. 1996).
*6 The trial court is able to make personal observations of the witnesses, while an appellate court has the benefit only of a cold transcript of the proceedings."
Ex parte J.W.B., 933 So.2d at 1087.
Furthermore, we are not called on to determine whether there are facts in the record that, when viewed in the manner suggested by the prospective adoptive parents, would support a different judgment. See Miller v. Associated Gulf Land Corp., 941 So.2d 982, 990 (Ala. Civ. App. 2005). " 'Appellate courts do not sit in judgment of disputed evidence that was presented ore tenus before the trial court ....' " Ex parte R.T.S., 771 So.2d 475, 476 (Ala. 2000) (quoting Ex parte Bryowsky, 676 So.2d 1322, 1324 (Ala. 1996) ). " ' "To substitute our judgment for that of the trial court would be to reweigh the evidence. This Alabama law does not allow." ' " Ex parte R.T.S., 771 So.2d at 476 (quoting Ex parte Bryowsky, 676 So.2d at 1324, quoting in turn Phillips v. Phillips, 622 So.2d 410, 412 (Ala. Civ. App. 1993) ).
The father's testimony, when viewed most favorably to the facts the probate court found, supports the probate court's determination that the father did not act in such a manner as to have abandoned the child in the six months before the child's birth in January 2013. As the prospective adoptive parents suggest, there was some evidence indicating that the father knew where the mother was located and could have contacted her after her arrest for burglary. Although the father testified that his cellular telephone had "died" and that, as a result, he had lost the mother's contact information, he said that the mother's brother had sent him a text message on his cellular telephone about the mother, indicating that he may have had a method by which to reach the mother or her family. However, the father also testified that he had not known with certainty where the mother was at the time he reported the burglary. According to the father, the mother had told him that she was living in Jacksonville, Florida, and working at a restaurant; the father said that he contacted the restaurant and that he was told that she was not employed there. He said that he suspected, and reported to the law-enforcement officials investigating the burglary, that the mother might be living with her mother in Green Cove Springs, Florida. The father further testified that the law-enforcement officials had asked him about the mother's whereabouts more than once and that she had not been immediately arrested on the burglary charge, indicating that, in fact, the mother had not been residing with her mother or that she was otherwise difficult for law enforcement to locate.
The prospective adoptive parents also make much of the fact that the father had the mother served with process of the Florida paternity and custody action in February 2013. However, contrary to the prospective adoptive parents' assertion that the mother was served at her mother's residence, the information contained in the record indicates that the mother was served by a special process server at a warehouse store and not at the Green Cove Springs address that the father had for the mother's mother. The father testified that he had made several attempts to serve the mother before one was successful and that at least one process server was informed that the mother did not live at her mother's address. Thus, the whole of the evidence, when viewed in the light most favorable to the probate court's judgment, supports the conclusion that the father was unaware of the mother's exact whereabouts and could not have contacted her between August 2012 and January 2013.
*7 According to the prospective adoptive parents, the father's failure to contact the mother while she was in jail and to offer to provide for her or to secure the welfare of the child is proof of abandonment. The father admitted that he had not contacted the mother while she was incarcerated. However, the record does not contain any evidence indicating the length of time the mother was incarcerated. The father testified that when he spoke to law-enforcement officials he mentioned that the mother was pregnant and indicated concern over the child's welfare; he said that they told him that it would be better for the child if the mother were in jail because she would not have the ability to abuse illegal drugs while there. The father also said that he had contacted the Florida Department of Children and Families about the child but that he had been informed that he could do nothing because the child had not been born and because he had not yet proven his paternity. The probate court could have believed the father's testimony that he had made appropriate inquiries regarding his ability to protect the welfare of the child but that he had been provided information indicating that he had no recourse before the child was born.
The probate court found that the father had contacted an attorney at the Judge Advocate General and that he had then been referred to a nonmilitary attorney. At that point, as the probate court recounted in its judgment, the father took the necessary steps to safeguard his legal rights as a father under Florida law. He sought to establish the child's paternity and to obtain custody of the child, and he timely registered with the Florida Putative Father Registry. Regarding his desire to be awarded custody of the child, the father said that the mother would not be a suitable parent, based on her drug use and other facts he had since learned about her, including her criminal history. The father testified that he had made inquiries at area hospitals around the expected date of the child's delivery to no avail. The evidence supports the conclusion that the father took steps indicating his interest in protecting the welfare of the child.
Admittedly, the father did not provide the mother financial or emotional assistance after she was arrested in late July or early August 2012 for burglarizing the father's house on July 14, 2012. Based on one view of the evidence, the father was not sure where the mother was residing. In addition, the testimony at trial indicated that the mother had left the father of her own accord; the evidence further suggests that she then lied to him about where she was residing and about having employment. The father testified that the mother had told him that she had left him so that she could "clear her mind because she was upset with [him]." He testified that he spoke with her on the telephone several times between the day she left, July 5, and the day before the burglary on July 14, 2012, and that she had vacillated between wanting to return to Middleburg and wanting to remain in, as far as the father knew, Jacksonville. The mother then burglarized the house, resulting in criminal charges against her. The testimony at trial suggested that law enforcement had had difficulty locating the mother and that, at least in January 2013, the mother was apparently not living with her mother at the only address the father had ever had for her.
The probate court could have concluded that the mother's conduct, and not that of the father, resulted in his inability to provide emotional or financial assistance to her. Based on the totality of the evidence before the probate court, we cannot conclude that its determination that the father did not impliedly consent to the adoption of the child under § 26-10A-9(a)(1) is not supported by the evidence. Accordingly, *8 we affirm the judgment of the probate court insofar as it decided the adoption contest in favor of the father.
The Father's Cross-Appeal
As noted above, the father challenged the October 3, 2016, judgment insofar as it assessed against him one-half of the guardian ad litem fee and "all additional costs of court." Under § 26-10A-24, a probate court is required to impose certain costs on a contestant depending on the results of the contest:
"(h) Where there is a contested case hearing, if the adoption is denied, then the probate court or court of competent jurisdiction, unless just cause is shown otherwise by the contestant, shall issue an order for reimbursement to the petitioner or petitioners for adoption for all medical and living expenses incidental to the care and well-being of the minor child for the time the child resided with the petitioner or petitioners for adoption.
"(i) Where there is a contested hearing and the contest fails, then the probate court or court of competent jurisdiction, unless just cause is shown otherwise by the contestant, shall issue an order for reimbursement to the petitioner or petitioners for adoption for all legal costs incurred which are incidental to the contest."
The father argues that the imposition of one-half of the guardian ad litem fee and the other legal costs of the action is not authorized under § 26-10A-24 because his contest was successful. We first note that, under Ala. Code 1975, § 26-10A-22, and Rule 17(d), Ala. R. Civ. P., a guardian ad litem fee is to be assessed as a court cost. The father argues that the prevailing rule is that costs of litigation are awarded to, and not imposed upon, the prevailing party. See Rule 54(d), Ala. R. Civ. P. (stating that, unless a statute provides otherwise, "costs shall be allowed as of course to the prevailing party"); and Townsend v. Hogan, 73 So.3d 702, 706 (Ala. Civ. App. 2011) (quoting Ennis v. Kittle, 770 So.2d 1090, 1091 (Ala. Civ. App. 1999), quoting in turn Merchants Nat'l Bank v. Cowley, 265 Ala. 125, 135, 89 So.2d 616, 625 (1956) )("Notably, '[i]n civil litigation, "the usual rule is to tax the costs in favor of the prevailing party." ' "). Of course, both the assessment of the guardian ad litem fee and "the taxation of costs [are] matter[s] within the sound discretion of the trial court"; both decisions are reviewed only for an abuse of the trial court's discretion. Townsend, 73 So.3d at 706 ; see also Rule 54(d) (indicating that, although costs are typically allowed to the prevailing party, a trial court may direct otherwise).
The father first argues that the guardian ad litem fee has no reasonable basis appearing of record and that the probate court's assessment of a $4,200 total guardian ad litem fee is therefore an abuse of discretion. Rule 17(d) requires that trial court "ascertain a reasonable fee or compensation to be allowed and paid to [a] guardian ad litem for services rendered," but the rule does not provide any guidance on how a fee is to be established. We have recently applied the principles applicable to a trial court's assessment of an attorney fee to the assessment of a guardian ad litem fee. Roberts v. Roberts, 189 So.3d 79, 84-85 (Ala. Civ. App. 2015). Thus, a trial court assessing a guardian ad litem fee should consider such factors as
"(1) the nature and value of the subject matter of the employment; (2) the learning, skill, and labor requisite to its proper discharge; (3) the time consumed; (4) the professional experience and reputation of the attorney; (5) the weight of his responsibilities; ... (10) the fee customarily charged in the locality *9 for similar legal services; (11) the likelihood that a particular employment may preclude other employment; and (12) the time limitations imposed by the client or by the circumstances."
Van Schaack v. AmSouth Bank, N.A., 530 So.2d 740, 749 (Ala. 1988).
Although the father admits that "when a trial court makes an award of attorney fees, it 'is not required to set forth a detailed analysis of all the applicable factors considered by it in exercising its discretion in establishing a reasonable attorney fee,' " Roberts, 189 So.3d at 85 (quoting Diamond Concrete & Slabs, LLC v. Andalusia-Opp Airport Auth., 181 So.3d 1071, 1076 (Ala. Civ. App. 2015) ), he contends that the probate court's failure to articulate in the judgment the basis for the guardian ad litem fee prevents "meaningful appellate review" of that fee. Indeed, our supreme court has indicated that "a trial court's order regarding an attorney fee must allow for meaningful appellate review by articulating the decisions made, the reasons supporting those decisions, and how [the trial court] calculated the attorney fee." Pharmacia Corp. v. McGowan, 915 So.2d 549, 553 (Ala. 2004). However, as was the case in Roberts, the record in the present case contains an affidavit from the guardian ad litem, who states that she had provided 21 hours of service in the case and that her hourly rate was $200, which rate, she stated, was reasonable in Jefferson and Shelby Counties. To be sure, the guardian ad litem's affidavit does not contain an itemization of services as did the affidavit in Roberts, see 189 So.3d at 85 ; however, she does state that her services included participating in a best-interest hearing, participating in a hearing on the costs due to the prospective adoptive parents, and receipt and review of multiple briefs during the pendency of the proceedings, most, if not all, of which the probate court was of no doubt aware. The father does not argue that $200 per hour is not a reasonable fee, and he does not specifically challenge the time the guardian ad litem expended other than to comment that the guardian ad litem did not telephone or visit with the father at any time during the pendency of this matter and to accuse the prospective adoptive parents of intentionally extending the pendency of the proceedings. Thus, we cannot conclude that the probate court's award of a $4,200 total guardian ad litem fee was an abuse of the probate court's discretion.
The father next asserts that the probate court's imposition of costs and one-half of the guardian ad litem fee upon him is, in this particular case, punitive, unjust, and an abuse of the probate court's discretion. Although he admits that Rule 54(d) permits a trial court to direct that costs be borne by the prevailing party, he contends that "if the court directs [that the prevailing party bear the costs], there must be good and articulated reasons" for that direction. However, as our supreme court has explained, Rule 54(d)"does not so require." Ex parte Osborn, 375 So.2d 467, 469 (Ala. 1979). Furthermore, "we will not reverse unless it appears from the record, after indulging all fair intendments in favor of the ruling, that the taxation of costs was unjust and unfair." City of Birmingham v. City of Fairfield, 396 So.2d 692, 697 (Ala. 1981) (citing Walden v. Walden, 277 Ala. 459, 171 So.2d 851 (1965) ). The appellate courts of this state have seldom reversed an allocation of costs among the parties,[2] and the father has not asserted a sufficient basis for finding that *10 the imposition upon him of costs and one-half of the guardian ad litem fee is unjust or unfair in this case. We therefore affirm the probate court's judgment insofar as it set the guardian ad litem's total fee and insofar as it assessed against the father one-half of that fee and the additional costs of court.
Conclusion
We have considered and rejected the arguments of the prospective adoptive parents in support of their contention that the probate court incorrectly determined that the father did not impliedly consent to the adoption of the child. We have also considered and rejected the father's arguments that the probate court erred in assessing the guardian ad litem fee and in ordering that he be responsible for one-half of that fee and for the additional costs of court. The October 3, 2016, judgment of the probate court is therefore affirmed in its entirety.
APPEAL-AFFIRMED.
CROSS-APPEAL-AFFIRMED
Thompson, P.J., and Pittman, Moore, and Donaldson, JJ., concur.

We note that the father states in his issue statement for his cross-appeal that he challenges the probate court's failure to disallow "excessive child care costs" requested by the prospective adoptive parents in their motion for reimbursement filed pursuant to § 26-10A-24(h). In the conclusion of his argument on his cross-appeal, the father states that "the taxing of reimbursement for expenses for caring for the child" was an abuse of discretion. The probate court's judgment complies with § 26-10A-24(h) and this court's directives in W.L.K. I and W.L.K. II, because a probate court is generally required to order a successful contestant in an adoption proceeding to reimburse the adoption petitioners for "all medical and living expenses incidental to the care and well-being of the minor child for the time the child resided with [them]." § 26-10A-24(h). A probate court may, if just cause is demonstrated, award a lesser amount than that claimed by the adoption petitioners, and, based on our review of the judgment, the probate court in the present case disallowed several of the claimed expenses, including those described as babysitting and child-care costs, awarding the prospective adoptive parents $25,331.85 instead of the more than $41,000 they requested in their motion for reimbursement. Because the father's brief does not contain a developed argument related to the failure of the probate court to disallow the challenged child-care costs, we consider this argument to have been abandoned by the father. See Braxton v. Stewart, 539 So.2d 284, 286 (Ala. Civ. App. 1988) (citing Ex parte Riley, 464 So.2d 92 (Ala. 1985) ) ("An appeals court will consider only those issues properly delineated as such, and no matter will be considered on appeal unless presented and argued in brief.").

For examples of those rare cases involving the reversal of an allocation of costs, see Dozier v. Payne, 244 Ala. 476, 478, 14 So.2d 376, 378-79 (1943), and Frawley v. U.S. Steel Min. Co., 496 So.2d 731 (Ala. 1986).