Rel: April 26, 2024

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# ALABAMA COURT OF CIVIL APPEALS

## OCTOBER TERM, 2023-2024

————————————————

### CL-2023-0572

————————————————

### T.E.B. and D.K.G.

### v.

### C.A.

### Appeal from Montgomery Probate Court
### (2022-A0019)

EDWARDS, Judge.

This is the second time these parties have appeared before this court to seek review of the actions or inaction of the Montgomery Probate Court ("the probate court") relating to the petition filed by T.E.B. and D.K.G. ("the prospective adoptive parents") seeking to adopt B.B.A. ("the

child"), the son of C.A. ("the biological mother"). See Ex parte T.E.B.,

[Ms. CL-2023-0261, July 7, 2023] ___ So. 3d ___ (Ala. Civ. App. 2023). We

explained the circumstances giving rise to the adoption petition and the

initial procedural history of the adoption action in Ex parte T.E.B.:

> "In July 2022, the biological mother, who was then pregnant with the child, met with Sarah Strength, a licensed independent clinical social worker, regarding the biological mother's potential intent to place the child for adoption with the prospective adoptive parents. Strength does not work for a particular adoption agency but is instead engaged by adoption agencies to perform birth-mother interviews. Strength explained the adoption process to the biological mother and reviewed with her the provisions of the [former] Alabama Adoption Code, Ala. Code 1975, [former] § 26-10A-1 et seq.,[1] regarding consent to adoption and the withdrawal of that consent. See Ala. Code 1975, [former] § 26-10A-13 (providing that a consent executed by parent may be withdrawn within five days of the birth of the child or the execution of the consent, whichever comes last, and that a consent executed by a parent may be withdrawn within 14 days of the birth of the child or the execution of the consent, whichever occurs last, 'if the court finds that the withdrawal

---

[1]In 2023, the legislature enacted the Alabama Minor Adoption Code, which is codified at Ala. Code 1975, § 26-10E-1 et seq., and which repealed the former Alabama Adoption Code, which was codified at former § 26-10A-1 et seq., effective January 1, 2024. Because the adoption petition at issue in this appeal was filed in 2022, it is governed by the provisions of the former Alabama Adoption Code. See Ala. Code 1975, § 26-10E-37(b) ("This chapter shall apply to all proceedings related to minor adoptions that have not been commenced as of December 31, 2023.").

is reasonable under the circumstances and consistent with the best interest of the child'). During the interview, which took about one and a half hours, Strength also accumulated information relating to the biological mother's health history. …

"On August 12, 2022, the biological mother gave birth to the child at a hospital in Birmingham. On that same date, and only a few hours after the child's birth, the biological mother contacted Strength regarding her decision to place the child for adoption. According to Strength, the biological mother requested that Strength come to the hospital so that the biological mother could complete the consent form and leave the hospital to go home to attend to her 16-year-old son …. Strength testified that the biological mother was upset when she arrived at the hospital, which Strength indicated was a typical reaction of a birth mother who was considering executing a consent to adoption, and that Strength communicated to the biological mother that she could take all the time she desired to execute the consent and that, if she decided she was not ready to execute the consent form, Strength would leave. Strength explained that she consulted with the biological mother's nurse and inquired whether the biological mother had been administered narcotic pain medication within the previous four hours; Strength said that the nurse confirmed that the biological mother had not been provided narcotic pain medication within the previous four hours. Although the biological mother did not immediately execute the consent upon Strength's arrival, she did execute the consent that same evening. The biological mother then left the hospital against medical advice. In addition, on or about August 16, 2022, the biological mother returned to the hospital at the request of the hospital staff to execute a document permitting the prospective adoptive parents to take the child home from the hospital. See Ala. Code 1975, [former] § 26-10A-15(a) (explaining that a health-care facility may not release a child into the custody of any person other than

3

specified entities or a 'parent, relative by blood or marriage, or person having legal custody, unless such surrender is authorized in a writing executed after the birth of the adoptee by one of the adoptee's parents or agency or the person having legal custody of the adoptee').

"On or about August 18, 2022, the biological mother sent a message to Strength, indicating that she was having second thoughts about giving the child up for adoption. According to Strength, she reminded the biological mother that she had until 14 days after the child's birth to file a motion with the probate court seeking to withdraw her consent to the adoption. In fact, Strength testified that she had sent the biological mother a photograph of [former] § 26-10A-13 to confirm the periods the biological mother had to file a petition to withdraw her consent.

"On August 19, 2022, Amy Osborne, the attorney for the prospective adoptive parents, mailed to the probate court a petition to adopt the child and the necessary supporting documents. The probate court docketed the adoption petition on August 23, 2022. The probate court did not immediately enter an interlocutory order of adoption. See [Ala. Code 1975, former] § 26-10A-18 [(providing, in pertinent part, that, '[o]nce a petitioner has received the adoptee into his or her home for the purposes of adoption and a petition for adoption has been filed, an interlocutory [order] shall be entered')].

"On August 24, 2022, the biological mother filed with the probate court a letter and a withdrawal-of-consent form that she had executed on August 22, 2022. In response to the biological mother's filing, which the probate court properly treated as a petition to withdraw her consent, the probate court, on September 19, 2022, set a hearing for October 12, 2022. The probate court did not enter an interlocutory order of adoption at any time before the date of the October 12, 2022, hearing."

4

___ So. 3d at ___ (footnotes omitted).

As we explained in Ex parte T.E.B., after the October 12, 2022, hearing, the probate court did not enter any order addressing whether the biological mother could withdraw her consent. On October 14, 2022, the probate court held a hearing at which it addressed its concern that Amy Osborne, the prospective adoptive parents' attorney, had made a misrepresentation regarding the Jefferson County Department of Human Resources ("the Jefferson County DHR") having issued a pickup order relating to the child based on the results of the testing of his meconium. That hearing did not address the issue of the biological mother's petition to withdraw her consent to the adoption. The probate court held a three-day evidentiary hearing on the issue of the withdrawal of the biological mother's consent on November 17, 18, and 21, 2022. After the conclusion of that evidentiary hearing, the probate court again failed to render or enter a judgment resolving the question whether the biological mother could withdraw her consent. Instead, the probate court urged the prospective adoptive parents to relinquish the custody of the child to the biological mother because, as we explained in Ex parte T.E.B., the probate court had a mistaken belief that it could not enter an

interlocutory order of adoption under Ala. Code 1975, former § 26-10A-18, after the biological mother had filed a petition to withdraw her consent and because the probate court erroneously insisted that the child had been improperly placed in the home of the prospective adoptive parents. ___ So. 3d at ___.

In January 2023, the prospective adoptive parents filed a motion seeking to have the probate court issue an interlocutory order of adoption pursuant to former § 26-10A-18. As we explained in Ex parte T.E.B.:

> "In an order dated February 13, 2023, the probate court ordered that the prospective adoptive parents provide a letter brief citing authority for the proposition that the probate court 'can enter an interlocutory order under ... [former] § 26-10A-18 ... when a withdrawal of consent has been filed by a birth parent pursuant to ... [former] § 26-10A-13(b).' The February 13, 2023, order also provided that the biological mother and [Vicky Toles,] the guardian ad litem [for the child,] should file a response to any letter brief filed by the prospective adoptive parents.
>
> "The probate court held yet another hearing on April 5, 2023. …
>
> "At the April 5, 2023, hearing, the probate court … entertained … argument on the issue of the request for entry of an interlocutory order of adoption. …
>
> "In an order entered on or about April 13, 2023, the probate court recounted the procedural history of this adoption proceeding.  … [T]he probate court denied the

6

> prospective adoptive parents' renewed request for an interlocutory order of adoption. The April 13, 2023, order d[id] not address the merits of the biological mother's still-pending petition to withdraw her consent to the adoption."

___ So. 3d at ___.

In response to the April 13, 2023, order denying their request for the entry of an interlocutory order of adoption, the prospective adoptive parents filed a petition for the writ of mandamus in this court, seeking a writ requiring the probate court to enter an order as required by former § 26-10A-18. Id. at ___. We denied their petition for the writ of mandamus, explaining that,

> "[a]lthough we conclude that the prospective adoptive parents are correct that the probate court was required by [former] § 26-10A-18 to enter an interlocutory order of adoption in response to the filing of the adoption petition and that the fact that the biological mother filed a petition to withdraw her consent to the adoption had no bearing on the initial issuance of the interlocutory order of adoption,"

id. at ___, the mandamus petition was untimely based on the "surrounding circumstances." Id. at ___. We based our decision on the lapse of time between the relinquishment of the child to the custody of the biological mother in November 2022 and the filing of the mandamus petition in April 2023 and on the fact that "the child will most certainly

7

be severely impacted by any order from this court requiring that the probate court enter an interlocutory order of adoption." Id. at ___. We noted that, as of the time of the issuance of our opinion in July 2023, the child had lived with the prospective adoptive parents for "approximately three months and was then placed into the custody of the biological mother, with whom he has now resided for seven months." Id. at ___. However, in light of the fact that the unnecessarily protracted adoption litigation had yet to produce an order resolving the determinative issue -- whether the biological mother could withdraw her consent to the adoption under Ala. Code 1975, former § 26-10A-13(b) -- we directed the probate court to enter an order deciding that issue within seven days of the issuance of our opinion. Id. ___.

In compliance with that directive, on July 14, 2023, nearly an entire year after the biological mother had filed her August 22, 2022, petition to withdraw her consent to the adoption, the probate court finally entered an order deciding that issue. In its order, the probate court concluded that the biological mother had presented evidence supporting the conclusion that the withdrawal of her consent was reasonable under the circumstances and that permitting the withdrawal of her consent would

8

be consistent with the best interest of the child. The prospective adoptive parents attempted to file a postjudgment motion on July 28, 2023, but the clerk of the probate court rejected the filing because it contained an electronic and not a "wet ink" signature; counsel for the prospective adoptive parents then sent an e-mail with a pdf copy of the motion to the probate-court clerk for filing and also sent a copy bearing a "wet ink" signature to the probate court via certified mail, which was received and docketed on July 31, 2023. The prospective adoptive parents filed a notice of appeal to this court on August 11, 2023.

Before turning to the substantive issues presented in the appeal, we first address whether this court has jurisdiction over the appeal. See G.C. v. Baldwin Cnty. Dep't of Hum. Res., 331 So. 3d 620, 621 (Ala. Civ. App. 2020) (indicating that an appellate court can notice the lack of a timely filed notice of appeal ex mero motu). Because the record revealed that the postjudgment motion had been filed in the probate court on July 31, 2023, we directed the parties to file letter briefs on the issue of the timeliness of this appeal. See Ala. Code 1975, former § 26-10A-26(a) (requiring appeal from final judgment in adoption proceeding be filed within 14 days of entry of judgment); former § 26-10A-14(e) (treating

9

order on petition to withdraw consent as final for purposes of appeal under former § 26-10A-26). In their letter brief, the prospective adoptive parents explained the facts relating to their attempt to file the postjudgment motion on July 28, 2023, as recounted above. Because this court cannot resolve factual disputes and because we could not know whether the circumstances outlined by the prospective adoptive parents were, in fact, true, we remanded the appeal to the probate court for it to determine whether an attempt to file the postjudgment motion in the probate court on July 28, 2023, had been made. On remand, the probate court determined that, although counsel of record for the prospective adoptive parents had not personally attempted to file the postjudgment motion, Lisa Bannister, an employee of counsel's law firm, had made such an attempt but was told that the motion would not be accepted because it bore only an electronic signature. Moreover, in its order on remand, the probate court recounted that Lisa Fells, the probate-court supervisor who had been an employee of the probate-court clerk's office for over 20 years, had testified that the clerk's office "has consistently returned documents that lack a wet[-ink] signature."

As counsel for the prospective adoptive parents has argued, the probate court was not permitted to refuse to accept the postjudgment motion on the ground that it bore an electronic signature. The Rules of Civil Procedure apply in the probate courts. <u>See</u> Ala. Code 1975, former § 26-10A-37 ("The Rules of Civil Procedure … apply to the probate court in adoption proceedings to the extent they apply under [Ala. Code 1975, §] 12-13-12."); Ala. Code 1975, § 12-13-12 ("The provisions of this code in reference to … pleading and practice … in the circuit court, so far as the same are appropriate, … in the absence of express provision to the contrary, are applicable to the proceedings in the probate court."). Rule 11(a), Ala. R. Civ. P., clearly states that, "[a]s provided in Rule 30(G) of the Alabama Rules of Judicial Administration, an electronic signature is a 'signature' under these Rules." <u>See also</u> Rule 30(G), Ala. R. Jud. Admin. ("The requirement that any court record or document be signed is met by use of an electronic signature."); <u>Ex parte Mealing</u>, 142 So. 3d 720, 727 (Ala. Civ. App. 2013) (stating that "Rule 30(G)[, Ala. R. Jud. Admin.,] and Rule 11(a)[, Ala. R. Civ. P.,] both indicate that electronic signatures are acceptable in court documents"). Regardless of its historical practice, the probate court may not demand that pleadings or motions contain a wet-

ink signature as a prerequisite for filing. Accordingly, we deem the postjudgment motion filed by the prospective adoptive parents, and, consequently, their notice of appeal, to have been timely filed. See Ex parte G.L.C., 281 So. 3d 401 (Ala. 2018); Johnson v. City of Tuscaloosa, 375 So. 3d 1241, 1252 (Ala. Civ. App. 2022).

Turning now to the substantive issues presented by this appeal, we must first summarize the evidence presented to the probate court relating to the biological mother's decision to withdraw her consent and to the best interest of the child. The biological mother testified that she had initially decided to seek adoption of the child because her boyfriend had ended their relationship, she was on unpaid maternity leave from her employment as a discount-store manager, and she was not convinced that she could provide materially for the child and her older son. She said that she had been very upset on August 12, 2022, when she signed the consent form and that she had also been upset when she had returned to the hospital on August 16, 2022, to sign the form authorizing the prospective adoptive parents to take the child home upon his discharge. She described herself as "an emotional wreck."

According to the biological mother, she had reconsidered her ability to provide for the child once she resumed her full-time employment after the child's birth. She admitted that she had previously given up her two daughters for adoption, but, she stated, she was "tired of giving [her] kids away." She also stated that "I just want [the child] back" and that "the best interest of [the child] is to be with his mother." She described her decision to place the child for adoption as a "last-minute decision" and said that it had been a mistake.

The biological mother testified that she had a "support system" and that her sister, her nieces, and her nephews lived in close proximity to her. However, when asked if her support system included the person who had driven her to the November 17, 2022, hearing, to which she had arrived two hours late, she stated that her transporter was not her only support and that her transporter had had a doctor's appointment that had caused the delay. The biological mother said that she "had" three automobiles, and, when asked if they "drove," she answered in the affirmative. She admitted that she had not driven herself to the hearing and that the three automobiles "need a little bit of work done to them."

13

In addition, the biological mother did not provide any plan for caring for the child while she worked, stating: "I plan on spending time with him once I get him." She did not explain how she would be able to do so when she had been unable to afford to provide for herself when she was on unpaid maternity leave; she testified that she had been employed by the discount store for only a year and a half at the time of her testimony at the November 17, 2022, hearing, and she did not explain whether she would be entitled to paid parental leave. She explained that her older son was autistic and could not care for himself but that he could talk. However, she testified on cross-examination that "[h]e's not as autistic as you're making him out to be" and described him as "no different from any other child." She said that, when she was working, her older son sometimes stayed home alone and at other times stayed with a friend who lived nearby. As previously noted, the biological mother had left the hospital against medical advice after the birth of the child because, she said, she had to get home to attend to her older son.

The biological mother described her home as a two-bedroom house and said that she owned the home. Although she testified that she used one bedroom and her older son used the other, the biological mother said

14

that she could, after the child grew older, make another room in the house into a bedroom for the child. She admitted that her water bill was in the name of another person; she said that she had been unable to secure water in the home in her name because, according to her, her sister had previously run up a water bill for another house in the biological mother's name.

Regarding her health, the biological mother testified that she had asthma, anemia, and had suffered from pregnancy-induced hypertension and preeclampsia. The biological mother admitted that she had a history of alcohol abuse. She also said that she had a history of depression that had resulted from the death of her parents in 2006 and 2009. She denied having had suicidal ideations. The biological mother said that she had a prescription for Xanax.

At the October 14, 2022, hearing, David Smith, a representative of the Alabama Department of Human Resources, testified that he had been informed by the Jefferson County DHR on that same date that the biological mother had tested positive for alcohol, benzodiazepine, amphetamines, and methamphetamine. He indicated, however, that he was not aware of whether the Jefferson County DHR had administered a

urine test or a hair-follicle test to the biological mother. Alicia Sexton, a representative of the Butler County Department of Human Resources ("the Butler County DHR"), testified at the November 17, 2022, hearing that the Montgomery County Department of Human Resources had asked the Butler County DHR for assistance in investigating the report that the child's meconium test had revealed that the child had been exposed to unnamed drugs. The biological mother also admitted at the November 17, 2022, hearing that she had been told that the child's meconium had tested positive for drugs. However, she testified at that hearing that the drug that she had been prescribed for high blood pressure during her pregnancy, Labetalol, could cause false-positive results, and she denied having used any illegal substances during her pregnancy. The biological mother also testified at the November 17, 2022, hearing that she had been investigated by the Jefferson County DHR, that she had tested negative on the drug screens that had been required by the Jefferson County DHR, and that, other than during the initial weekend after the report was received by the Jefferson County DHR, during which her older son had stayed with her sister, the biological mother had not been deprived of her older son's custody.

16

D.K.G., the prospective adoptive mother, testified that she and T.E.B., the prospective adoptive father, had been married for eight years; that T.E.B. had two older children from a previous relationship, who were 24 and 15 years old; that the 15-year-old, who was a daughter, lived with them; and that she and T.E.B. had a 5-year-old daughter together. She explained that she and T.E.B. both worked for the federal government, that she typically worked in the office only one day per week, and that T.E.B.'s job was entirely remote. According to D.K.G., she and T.E.B. had negotiated parental-leave time that would permit each of them to work only one-half of each day so that one of them would be available at all times to care for the child in his early months of life. As the probate court noted in its July 14, 2023, order, the prospective adoptive parents' combined yearly income exceeded $240,000.

D.K.G. explained that, after their parental leave was exhausted in February 2023, they intended to hire a nanny to care for the child during the day; she noted, however, that T.E.B. would be in the home during the workday. She also explained that they expected to enroll the child in a Montessori school once he reached age one. D.K.G. testified that their home had four bedrooms and that the child would have his own room

17

once he reached the appropriate age. She said that she had a strong support group of other mothers and that T.E.B.'s 24-year-old son was also available and willing to provide assistance as needed. She said that the T.E.B.'s son, his daughter, and her and T.E.B.'s daughter all loved the child.

In addition, D.K.G. described the child as having suffered from jerky movements and having been easily awakened when he had first come to their home from the hospital. She said that the hospital's discharge papers had indicated that the child was suffering from nicotine withdrawal. She also noted that hospital personnel had informed her to watch for the child to "sneeze in threes," which, she said, he did.

Strength testified that the biological mother had recounted to her that she had had a history of alcoholism after the death of her parents; the birth-mother-interview form that Strength completed is contained in the record on appeal and indicates that the biological mother had also reported to Strength that she had been sober for three years. Strength also testified that the biological mother had admitted to having a history of depression and suicidal ideation. According to the birth-mother-interview form, the biological mother had dropped out of high school in

18

the 10th grade because she was "boy crazy," but the form indicates that the biological mother had received her GED. Although the birth-mother-interview form reflects that the biological mother's current employment was with a discount store, the form further reflects that the biological mother had not revealed any prior employment to Strength, who had drawn a line through the blank on the form that provided for the biological mother's response. The birth-mother-interview form also indicates that the biological mother informed Strength during her interview in July 2022 that she had anemia, asthma, pregnancy-induced hypertension, and preeclampsia and that she smoked one pack of cigarettes per day. According to the information provided by the biological mother to Strength, as recorded on the birth-mother-interview form, the biological mother did not have private insurance, was qualified for Medicaid, and received food stamps.

Vickie Toles, the child's guardian ad litem, testified that she had been to the homes of both the biological mother and the prospective adoptive parents. She stated that, in her opinion, both homes were suitable for the child and that both the biological mother and the prospective adoptive parents could provide for the child's necessities. She

19

said that the biological mother's home was small but that she had observed that

> "there was a little small area. I don't know -- it looks like it may have been set up for a -- maybe like an office space or something. That's off of the -- off of the kitchen slash bedroom area. That had enough space that the -- that could be converted back into some kind of room there or something in that respect …."

Toles testified that she did not compare the varying financial capabilities of the biological mother and the prospective adoptive parents in her analysis of the best interest of the child, explaining:

> "You're asking about a future question. To be honest with you, the [prospective adoptive parents] could lose everything that they got today or tomorrow, and they could be in the same situation that [the biological mother] is in. So that's not a fair question to ask me because either one of those or she could go out and hit the lottery, and she could be the richest woman in the world."

In her testimony, Toles opined that the child's best interest would be better served by placement with the biological mother, citing two reasons: the fact that the biological mother would be able to provide information relevant to the child's medical history and the fact that the child might suffer some emotional upset in the future upon learning that he was adopted. She explained that "the traumatic experience that

20

happens for many children that I've seen turns out to be why did my momma give me up? Why did my daddy leave me? It is an issue for children. The abandonment is a serious issue for them." She also indicated that the fact that the biological mother may not have reliable transportation was not a concern for her because she believed that parents could provide for their children even without reliable transportation.

In its July 14, 2023, order, the probate court determined that the biological mother's decision to withdraw her consent was reasonable under the circumstances. The probate court explained that the biological mother had described her decision to allow the child to be adopted as a mistake "borne out of her belief that she could not raise the child, in addition to her teenaged son, by herself." The order states that the biological mother believed that she could not rear her children without a father but that she had "realized [she] could do it by [her]self" in the days after signing the consent form. The probate court also stated that it had considered the biological mother's statements regarding her "mindset" at the time she had executed the consent form.

Regarding the requirement that the withdrawal of consent be consistent with the best interest of the child, the probate court stated in its order that it had considered the "'sex, age, and health of the child[]; the child[]'s emotional, social, moral, and material needs; and the … parties' ages, character, stability, health, and home environment.' T.D.P. v. D.D.P. and W.H.P., 950 So. 2d 311, 316 (Ala. Civ. App. 2006)." Relying on Toles's belief that the biological mother's "smaller home and limited financial resources" did not make her an inferior choice, the probate court concluded that both the prospective adoptive parents and the biological mother could meet the needs of the child. The probate court found that the prospective adoptive parents could provide a loving home for the child and, moreover, that they could provide "every societal and educational advantage imaginable." The probate court then concluded that it could not determine that placement in the biological mother's home "would not be in [the child's] best interest," "that the essentials of a loving home are lacking in her home," "or that [the child's] character, stability, health, or home environment would be lacking in any meaningful way."

According to the probate court, it was also convinced by the biological mother's "experience in observing the impact of adoption on her

daughters" to conclude that adoption would not be in the child's best interest. The probate court relied on statements made by the biological mother in a letter she had mailed to the probate court in December 2022, after the completion of the hearing on the issue of the withdrawal of her consent. In that letter, which appears to have been, in part, a response to the prospective adoptive parents' motion to reopen the evidence to admit the records from St. Vincent's Hospital, where the child was born, the biological mother stated that her daughters "suffer tremendously" from her decision to place them for adoption.[2] She said that they "battle depression," blame themselves for her decision, and believe that, had they been born male, the biological mother would have kept them. The

---

[2]The statements in the biological mother's letter in response to the prospective adoptive parents' motion are technically not evidence. See Guthrie v. Alabama Dep't of Labor, 160 So. 3d 815, 819 (Ala. Civ. App. 2014) (quoting Griffin v. Griffin, 159 So. 3d 67, 70 (Ala. Civ. App. 2014)) (stating, in an appeal involving a pro se party, that "'statements or arguments ... made in a motion do not constitute evidence'"). However, the prospective adoptive parents have not objected to the probate court's reliance on those statements, and we therefore have no basis to reject them. See Armstrong v. Armstrong, 515 So. 2d 27, 28 (Ala. Civ. App. 1987) (stating that "[i]f illegal evidence is presented without objection, it is properly admitted and the trier of facts may consider it" and that "[e]videntiary issues will not be considered upon appeal in the absence of an objection or in the absence of an adverse ruling by the trial court").

biological mother also described her daughters as "miserable" and said that they "live[] everyday wondering why they weren't good enough." She also reported that they "feel out of place, rejected from day [one] on this earth, [and] don't know who they are and are afraid to love." Moreover, as mentioned above, Toles testified, without objection, that adoption was traumatic for many children, who, she indicated, questioned why their parent or parents had chosen adoption and who suffered feelings of abandonment.

Citing A.E.C. v. J.R.M., 46 So. 3d 481, 499 (Ala. Civ. App. 2009) (quoting Good v. Zavala, 531 So. 2d 909, 910 (Ala. Civ. App. 1988)), the prospective adoptive parents contend that "'[a] natural parent's mere change of mind cannot justify a rescission of the natural parent's consent to an adoption provided the natural parent gave an informed, intelligent consent and all of the procedural safeguards were followed.'" We note, however, that that particular principle of law arose under the adoption code as it existed before the former Alabama Adoption Code, which was enacted in 1990. The former versions of the adoption code contained no provisions governing the withdrawal of a natural parent's consent to an adoption. See Ala. Code 1975, former § 26-10-3; Ala. Code 1940 (Recomp.

24

1958), Title 27, § 3; Ala. Code 1940, Title 27, § 3; Williams v. Pope, 281 Ala. 416, 420, 203 So. 2d 271, 275 (1967) ("[O]ur statutes are silent as to the revocation of consent."). In 1990, before the enactment of the former Alabama Adoption Code, our supreme court summarized the rule governing the withdrawal of consent:

> "'The rule in Alabama is that, once a valid consent to adopt has been given and the child has been placed in the custody of the adoptive parents, consent can only be revoked for legal cause, such as where the consent was procured through fraud, undue influence, coercion, or other improper methods or where, under all the circumstances, the trial court finds it to be in the best interest of the child for it to be returned to the natural parents.'"

Ex parte Fowler, 564 So. 2d 962, 965 (Ala. 1990) (quoting In re Miller, 473 So. 2d 1069, 1070 (Ala. Civ. App. 1985)). Former § 26-10A-13(a) and (b) changed the then-existing adoption law and allowed for a natural parent to change his or her mind about consenting to an adoption. Thus, we do not find this argument convincing.

We have no caselaw interpreting the application of the requirements for the withdrawal of consent as set out in former § 26-10A-13(b). However, we have before explained that a determination of the reasonableness of the withholding of consent to adoption by the

25

Department of Human Resources under Ala. Code 1975, former § 26-10A-7(4), is a question of fact. See R.L.T. v. State Dep't of Hum. Res., 668 So. 2d 862, 864 (Ala. Civ. App. 1995); In re Roland, 483 So. 2d 1366, 1368 (Ala. Civ. App. 1985). We see no basis for distinguishing between the reasonableness of withholding consent and the reasonableness of withdrawing consent; thus, the question regarding the reasonableness of the biological mother's decision to withdraw her consent to the adoption is also a question of fact. Likewise, we have stated that the decision respecting the custody of children is left to the discretion of the trial court, Sockwell v. Sockwell, 822 So. 2d 1219, 1223 (Ala. Civ. App. 2001), and that "[t]here is no wider area for the exercise of judicial discretion than that of providing for and protecting the best interests of children." McDaniel v. McDaniel, 621 So. 2d 1328, 1330 (Ala. Civ. App. 1993).

> "'Where a probate court hears ore tenus evidence on a petition for adoption, its findings and conclusions based on that evidence are presumed to be correct.' K.P. v. G.C., 870 So. 2d 751, 757 (Ala. Civ. App. 2003). The ore tenus presumption of correctness arises because the trial court is in a position to observe the demeanor and behavior of the witnesses and is thus able to evaluate whether their testimony is credible and truthful. Ex parte Fann, 810 So. 2d 631, 633 (Ala. 2001); Ex parte Bryowsky, 676 So. 2d 1322, 1324 (Ala. 1996). The trial court is able to make personal observations of the witnesses,

26

> while an appellate court has the benefit only of a cold transcript of the proceedings."

Ex parte J.W.B., 933 So. 2d 1081, 1087 (Ala. 2005). As our supreme court has observed, "[t]his opportunity to observe witnesses is especially important in child-custody cases. 'In child custody cases especially, the perception of an attentive trial judge is of great importance.'" Ex parte Fann, 810 So. 2d 631, 633 (Ala. 2001) (quoting Williams v. Williams, 402 So. 2d 1029, 1032 (Ala. Civ. App. 1981)).

Because we are constrained by the ore tenus presumption, we cannot reweigh the evidence presented to the probate court. Ex parte J.W.B., 933 So. 2d at 1087. The probate court viewed the parties during their testimony and was therefore able to determine the veracity of that testimony. Id. From that testimony, the probate court could have been convinced that the biological mother's decision to withdraw her consent was reasonable under the circumstances and that allowing the biological mother to withdraw her consent would be in the best interest of the child. We therefore affirm the probate court's July 14, 2023, order determining that the biological mother's withdrawal of her consent was reasonable

27

under the circumstances and consistent with the best interest of the child.

The prospective adoptive parents contend that, once it determined that the biological mother could withdraw her consent, the probate court was required, pursuant to Ala. Code 1975, former § 26-10A-3, to transfer the adoption action to the Montgomery Juvenile Court for that court to consider the termination of the biological mother's parental rights. However, as a plurality of this court explained in Ex parte W.L.K., 175 So. 3d 652, 658 (Ala. Civ. App. 2015), the field of operation of former § 26-10A-3 is not quite so large as to compel a probate court to transfer an adoption action to a juvenile court for termination of parental rights when a natural parent has successfully mounted a challenge to the adoption. Although Ex parte W.L.K. involved a successful contest to an adoption based on a probate court's conclusion that a natural father had not impliedly consented to the adoption based upon his conduct, pursuant to Ala. Code 1975, former § 26-10A-9(a)(1), 175 So. 3d at 655, and not the resolution of a petition to withdraw consent under former § 26-10A-14, the same result obtains in the present case.

28

Former § 26-10A-14(e) required the probate court to "order the minor restored to the custody of his or her parent" if it determined that the parent may withdraw his or her consent. Moreover, Ala. Code 1975, former § 26-10A-24(a)(4), provided that a probate court shall consider "[w]hether a consent … may be withdrawn" at a contested hearing. Former § 26-10A-24(d)(4) required that an adoption action be <u>dismissed</u> if the probate court determined that "a necessary consent may be withdrawn."

We conclude, as did a plurality of this court in <u>Ex parte W.L.K.</u>:

"[A]lthough, according to the prospective adoptive parents, [former] § 26-10A-3 appears to require the transfer of an adoption proceeding in every situation where a parent has failed to give his or her consent, enforcing the transfer provision contained in [former] § 26-10A-3 after a parent has successfully [withdrawn consent to] the adoption would leave no field of operation for the requirement in [former] § 26-10A-24(d) that the adoption proceeding be dismissed after [the probate court permits the withdrawal of a consent to the adoption]. Enforcing [former] § 26-10A-24(d) and requiring dismissal of an adoption proceeding after [withdrawal of a consent is permitted], however, leaves room for the operation of [former] § 26-10A-3 in those adoption proceedings in which a parent does not [seek to withdraw his or her consent] but fails to consent or is unable to do so. Such a construction of the two provisions is supported by the language used in the statutes, and it also meets our duty '"to harmonize and reconcile all parts of a statute so that effect may be given to each and every part."'"

29

175 So. 3d at 658-59 (quoting <u>Hays v. Hays</u>, 946 So. 2d 867, 877 (Ala. Civ. App. 2006), quoting in turn <u>Leath v. Wilson</u>, 238 Ala. 577, 579, 192 So. 417, 419 (1939)).

Finally, the prospective adoptive parents contest the probate court's July 14, 2023, order insofar as it directs that they pay $11,000 to cover the guardian ad litem's fee and costs. Citing <u>Ex parte Shinaberry</u>, 326 So. 3d 1037 (Ala. 2020), they specifically contend that the award of the guardian ad litem's fee should be reversed because, they say, Toles did not provide an itemized statement of the hours expended to support her $6,187.50 fee. However, Toles filed in the probate court an itemized statement supporting that fee, which appears on page 256 of the record. The prospective adoptive parents, apparently unaware of that filing, did not object to any particular aspect of the guardian ad litem's fee, and, thus, we have no arguments to consider regarding its reasonableness. See <u>T.C.M. v. W.L.K.</u>, 248 So. 3d 1, 9 (Ala. Civ. App. 2017) (affirming the award of a guardian ad litem's fee when "[t]he father [did] not argue that $200 per hour [was] not a reasonable fee, and [did] not specifically challenge the time the guardian ad litem expended"). Accordingly, we

affirm the order insofar as it directs the prospective adoptive parents to pay the guardian ad litem's fee of $6,187.50.

However, we agree with the prospective adoptive parents that the remaining portion of the $11,000 they were ordered to pay -- $4,812.50 -- which apparently represents the costs of the adoption action, has no support in the record. The prospective adoptive parents challenged the award of unspecified costs in their postjudgment motion.

> "'[A] party aggrieved by an award of costs may appeal the propriety of such an award, even where the merits of the underlying case are not before the appellate court.' Garrett v. Whatley, 694 So. 2d 1390, 1391 (Ala. Civ. App. 1997) (citing City of Birmingham v. City of Fairfield, 396 So. 2d 692, 694 (Ala. 1981)). However, our review of a trial court's order taxing costs pursuant to Rule 54(d)[, Ala. R. Civ. P.,] is limited to determining whether 'a clear abuse of discretion' is present. Garrett, 694 So. 2d at 1391."

Bundrick v. McAllister, 882 So. 2d 864, 866 (Ala. Civ. App. 2003).

No party filed a motion seeking an award of costs, no cost bill appears in the record, and the order does not provide an itemization of the costs being assessed against the prospective adoptive parents. Although we are well aware that Rule 54(d), Ala. R. Civ. P., provides that the prevailing party is typically permitted an award of costs, the rule does not set out the procedure for compiling those costs or for challenging an

award of costs by the court in its judgment.[3]  However, as is the case with attorney fees and guardian ad litem fees, the award of costs must contain sufficient specificity to provide for the ability to challenge the assessment of those costs and for meaningful appellate review.  See T.C.M., 248 So. 3d at 9 (quoting Pharmacia Corp. v. McGowan, 915 So. 2d 549, 553 (Ala. 2004)) (explaining that an attorney-fee award should provide information including an articulation of the decision made, the basis for that decision, and the calculation of the fee to "'allow for meaningful appellate review'").  Because the record does not reveal the particular costs assessed against the prospective adoptive parents, they have not had an opportunity to challenge any costs that they might deem to be excessive, duplicative, or improper, and this court certainly cannot provide any meaningful appellate review of the assessment of those costs. Accordingly, we reverse that portion of the order assessing $4,812.50 in costs against the prospective adoptive parents, and we remand the case for the probate court to itemize the costs it assessed against the

---

[3]Rule 54(d) provides that the clerk may tax costs and that, if a party desires to challenge taxation of costs by the clerk, the party must file a motion seeking review of the award by the trial court.

prospective adoptive parents and to permit them, if necessary, to challenge any particular costs.

AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.

Moore, P.J., and Fridy and Lewis, JJ., concur.

Hanson, J., recuses himself.